UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 21 CR 158 |
| v. | ) | |
| | ) | Hon. Thomas M. Durkin |
| MARCO A. PORRAS | ) | |

**GOVERNMENT'S REPONSE TO DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

STATUTORY BACKGROUND .......................................................................... 3

ARGUMENT ........................................................................................................ 6

    I.      Section 1326 Is Subject to Rational-Basis Review and It Easily
           Passes that Test. ................................................................................... 6

    II.    Defendant's Challenge Fails Under the *Arlington Heights*
           Standard. ............................................................................................. 13

        A.     Defendant Cannot Establish Discriminatory Intent in the
                Passing of § 1326. ...................................................................... 15

        B.     Defendant's Attempt to Impute the 70th Congress's Intent on
                the 82nd and Later Congresses Is Inconsistent with the
                Historical Record and Supreme Court Precedent. ............................... 22

        C.     Section 1326's Impact on Mexican and Latinx Defendants
                Does Not Give Rise to an Inference of Discriminatory Intent. ............. 27

    III.   In Any Event, Congress Would Have Passed § 1326 Absent the
           Alleged Animus. ................................................................................. 31

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................................. passim

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ........................................... 7

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................. 7

*Arlington Heights v. Metropolitan Housing Development Corp.*, 429
U.S. 252 (1977) ...................................................................................................... passim

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ................................................................. 7, 11

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) ............................................................ 24, 27

*City of Chicago v. Shalala*, 189 F.3d 598 (7th Cir. 1999) ........................... 8, 9, 12, 13

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ........................................... 24, 25, 27, 28

*Cook County, Illinois v. Wolf*, 461 F. Supp. 3d 7799 (N.D. Ill. 2020 .......................... 12

*Department of Homeland Sec. v. Regents of the Univ. of California*, 140
S. Ct. 1891 (2020) .................................................................................................. passim

*Fiallo v. Bell*, 430 U.S. 787 (1977) ....................................................... 7, 8, 11, 12

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) .......................................................... 7

*Heller v. Doe*, 509 U.S. 312 (1993) .................................................................... 8, 13

*Hudson v. United States*, 522 U.S. 93 (1997) ............................................................. 13

*Hunter v. Underwood*, 471 U.S. 222 (1985) ................................................... 15, 16, 23

*Johnson v. Governor of the State of Florida*, 405 F.3d 1214 (11th Cir.
2005) .................................................................................................................... 25, 26

*Kimbrough v. United States*, 552 U.S. 85 (2007) ....................................................... 18

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ................................................................ 7

*Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) ........................................ 9

*Ledezma-Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017) ...................................... 11

*Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) ................................................... 9

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) ................................................................ 15

*Mathews v. Diaz*, 426 U.S. 67 (1976) ........................................................ 7, 8, 10, 12

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................ 24, 26

*Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320 (1909) ...................................... 7

*Pena-Cabanillas v. United States*, 394 F.2d 785 (9th Cir. 1968) ...................... 10, 16

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) .................................. 15, 28, 31

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) .............................................................. 11

*Robledo-Gonzales v. Ashcroft*, 342 F.3d 667 (7th Cir. 2003) ............................ 9, 10, 13

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ...................................................... 7, 8, 11, 12

*United States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103
(W.D. Okla. Nov. 16, 2021) ...................................................................................... 2, 13

*United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003) .................................. 30

*United States v. Baeza-Suchil*, 52 F.3d 898 (10th Cir. 1995) ................................... 10

*United States v. Carlos-Colmenares*, 253 F.3d 276 (7th Cir. 2001) ........... 1, 10, 12, 13

*United States v. Carrillo-Lopez*, No. 3:20-cr-00026-MMD-WGC, 2021
WL 3667330 (D. Nev. Aug. 18, 2021) ................................................................ passim

*United States v. Coleman*, 24 F.3d 37 (9th Cir. 1994) ............................................... 30

*United States v. Corrales-Beltran*, 192 F.3d 1311 (9th Cir. 1999) ............................ 19

*United States v. Dumas*, 64 F.3d 1427 (9th Cir. 1995) ............................................... 30

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ............................................. 31

*United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH,
2021 WL 2138801 (D. Ariz. May 25, 2021) .................................................................. 2

*United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998)............... 10, 13

*United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774
(S.D. Tex. Feb. 2, 2022)..................................................................................... 2, 15, 16

*United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994).............................. 22, 26, 30

*United States v. Lue*, 134 F.3d 79 (2d Cir. 1998) ........................................................ 11

*United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738
(D. Or. Aug. 2, 2021) ................................................................................. passim

*United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996
(W.D. Okla. Jan. 10, 2022) ................................................................................ 2, 13

*United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL
4998418 (C.D. Cal. Jan. 5, 2021) ............................................................................ 2

*United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) ........................................ 19, 20

*United States v. Montenegro*, 231 F.3d 389 (7th Cir. 2000) ...................................... 9

*United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL
508892 (E.D. Wash. Feb. 18, 2022) ........................................................................ 2, 15

*United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL
3570229 (D. N.M. Aug. 12, 2021) ........................................................................... 2, 13

*United States v. O'Brien*, 391 U.S. 367 (1968) ...................................... 16, 17, 22, 23

*United States v. Ortiz-Martinez*, 557 F.2d 214 (9th Cir. 1977) ................................ 17

*United States v. Owolabi*, 69 F.3d 156 (7th Cir. 1995) ............................................ 10

*United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990
(S.D. Cal. Feb. 16, 2022) ....................................................................................... 2

*United States v. Rivera-Sereno*, No. 21-cr-129, 2021 WL 5630728 (S.D.
Ohio Dec. 1, 2021) ............................................................................................... 2, 13

*United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL
5166488 (N.D. Ohio Nov. 5, 2021) ........................................................................ 2, 13

*United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL
6125407 (D. Colo. Dec. 28, 2021) .................................................... 2, 6, 15, 22

*United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228
(D. Colo. Feb. 1, 2022) ....................................................................................... 2, 6

*United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956
(S.D.N.Y. Oct. 20, 2021) ...................................................................................... 2

*United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I.
June 16, 2021) ....................................................................................... 2, 15, 22

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................................ 14

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................................ 7

*Wong v. United States*, 163 U.S. 228 (1896) ............................................................ 10

## STATUTES

8 U.S.C. § 1182(c) ...................................................................................................... 9

8 U.S.C. § 1324(a) .................................................................................................... 21

8 U.S.C. § 1326 .......................................................................................... 1, 3, 5, 20

Pub. L. No. 64-301 ...................................................................................................... 3

Pub. L. No. 70-1018 .................................................................................................... 4

Pub. L. No. 82-283 .................................................................................................... 21

Pub. L. No. 82-414 ................................................................................................. 4, 5

Pub. L. No. 100-690 .................................................................................................... 5

Pub. L. No. 101-649 .................................................................................................... 5

Pub. L. No. 103-322 .................................................................................................... 5

Pub. L. No. 104-132 .................................................................................................... 6

Pub. L. No. 104-208 .................................................................................................... 6

U.S. Const. amend. V .................................................................................................. 7

## INTRODUCTION

Defendant Marco A. Porras's Motion to Dismiss, R. 31, challenges the constitutionality of a longstanding federal criminal statute. That statute, 8 U.S.C. § 1326, makes it a felony to reenter or be found in the United States after having been deported. As the Seventh Circuit has said, it is a part of a "national policy of excluding illegal—especially, previously deported—aliens." *United States v. Carlos-Colmenares*, 253 F.3d 276, 278-79 (7th Cir. 2001). Defendant, however, contends that Congress acted with discriminatory intent against Mexican and Latinx individuals in enacting § 1326, and it therefore violates his equal-protection rights. *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). That claim fails for multiple reasons.

Defendant's challenge goes to a core immigration regulation—over which Congress has plenary power—and it is therefore subject to the deferential rational-basis review. Section 1326 easily passes that review, as it acts as a deterrent against successive illegal reentry. Even if the standard set forth in *Arlington Heights* applied, though, defendant has not met his burden of showing discriminatory intent. There is scant evidence suggesting animus on Congress's part in passing § 1326 in 1952 or later amending it. The principal argument, instead, is that this Court should infer animus based on the comments of certain members of a Congress that preceded § 1326's enactors by two decades. That leap is inconsistent with the historical record, which shows little discrimination on the part of the 1952 Congress, and Supreme Court precedent, which affords a good-faith presumption to legislative action and

1

disapproves of imputing one Congress's motives to another. And even if there were some degree of animus in § 1326's passing (which defendant has not shown), the record shows Congress would have passed the illegal-reentry statute in its absence.

Defendant's challenge is one in a growing line concerning § 1326.[1] It relies exclusively on a single outlier decision—*United States v. Carrillo-Lopez*, No. 3:20-cr-00026-MMD-WGC, 2021 WL 3667330 (D. Nev. Aug. 18, 2021)—which is currently on appeal in the Ninth Circuit. *Carrillo-Lopez* admitted that its decision to strike down a facially neutral, federal criminal statute for being enacted with racial animus was "unprecedented." *Id.* at *19. It was also wrong. The Court should deny the Motion, just like every district court before and after *Carrillo-Lopez* has done.[2]

---

[1] There are multiple such motions pending in this district. *See, e.g.*, *United States v. Alfredo Viveros-Chavez*, Case No. 21-CR-665 (N.D. Ill.) (ECF No. 25) (Kennelly, J.); *United States v. Calvillo-Diaz*, Case No. 21-CR-445 (N.D. Ill.) (ECF No. 19) (Tharp, J.); *United States v. Fuentes-Santos*, Case No. 21-CR-430 (ECF No. 34) (Lefkow, J.); *United States v. Leonides-Seguria*, Case No. 21-CR-390 (N.D. Ill.) (ECF No. 35) (Feinerman, J.).

[2] *United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022); *United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022); *United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022); *United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United States v. Rivera-Sereno*, No. 21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021); *United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021).

## FACTUAL BACKGROUND

Defendant was born in Mexico and has no current legal claim to U.S. residence. R. 1, Compl. ¶¶ 4, 5, 11. In 2005, he was convicted in Cook County of a drug-related felony and sentenced to four years in prison. *Id.* ¶ 5. Following that conviction, he was deported to Mexico in November 2009. *Id.* ¶ 6. In July 2019, defendant was convicted of illegal reentry in the Northern District of Illinois and deported again in November 2019. *Id.* ¶¶ 6-7.

A grand jury returned an indictment against defendant charging him with illegal reentry, in violation of 8 U.S.C. § 1326, for being "found in" the United States after being deported twice and without having applied for readmission. Indictment, R. 10. As noted in the indictment, because of defendant's previous conviction, he is subject to a maximum 10-year term of imprisonment under § 1326(b)(1). *Id.*

## STATUTORY BACKGROUND

In the Immigration Act of 1917, the 65th Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. With the exception of individuals who had been deported for immoral acts, the Immigration Act of 1917 imposed no penalty for reentering after deportation, other than repeated deportation. In 1929, to enhance the deterrent value of the deportation laws, the 70th Congress made "enter[ing] or attempt[ing] to enter" the United States after deportation a felony offense punishable by up to two years' imprisonment. *See* Act of

3

Mar. 4, 1929, Pub. L. No. 70-1018.[3] The Senate Report from the Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929) (attached as Exhibit A).

More than two decades later, in 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), a comprehensive act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). In the lead-up to enacting the INA, the Senate Judiciary Committee was tasked with making "a full and complete investigation of our entire immigration system" and providing "recommendations for changes in the immigration and naturalization laws as it may deem advisable." S. Rep. No. 81-1515, at 803 (1950) (excerpts attached as Exhibit B). The investigation yielded a 925-page report, which, among other things, described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area." *Id.* at

---

[3] The 1929 Act was not titled "the Undesirable Aliens Act." *See* Mot. at 6. A more expansive bill bearing that name was introduced in the House. *See* H.R. Rep. No. 70-2418, at 12 (Feb. 7, 1929) (Sec. 10); 70 Cong. Rec. 3542 (Feb. 15, 1929). But the House ultimately abandoned the name. *See* 70 Cong. Rec. 4952 (Mar. 1, 1929) (explaining the development of the Act and "[t]hat the House recede[d] from its amendment to the title of the bill").

654-55. It also noted that existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor." *Id.* at 655.

Congress responded with § 276 of the INA, codified as 8 U.S.C. § 1326. In line with the Committee's recommendation, the INA eliminated the disparate penalties applicable to reentry defendants depending on the basis for their deportation, creating instead a single offense that subjected all reentry defendants to the same penalties as the 1929 Act: two years' imprisonment and a fine. Pub. L. No. 82-414, § 276, 66 Stat. 230. The statute also sought to offset some difficulties in enforcing prior statutes by adding a new basis for liability—being "found in" the United States without authorization—to "overcome the inadequacies in existing law," namely, the difficulty in finding proper venue if the place of reentry was unknown. *See* Statement of Dep. AG Ford at 6 (May 14, 1951) (attached as Exhibit C). Congress passed § 1326, and the broader INA, with a supermajority of votes over President Harry Truman's veto.

Congress has since altered § 1326 on multiple occasions, increasing its deterrent value each time. In the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to Section 1326, creating enhanced penalties for aliens, such as defendant, with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing

penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

## ARGUMENT

Defendant's Motion makes little argument apart from summarizing the analysis and holding of *Carrillo-Lopez*. This Court should decline to follow that outlier, and it should reject defendant's invitation to "incorporate" *Carrillo-Lopez*'s record, finding, or conclusions. Mot. at 4; *see, e.g.*, *Sifuentes-Felix*, 2022 WL 293228, at *3 (declining defendant's request to adopt *Carrillo-Lopez*'s findings); *Sanchez-Felix*, 2021 WL 6125407, at *7 (same).[4]

## I. Section 1326 Is Subject to Rational-Basis Review and It Easily Passes that Test.

Defendant's challenge is subject to—and fails under—the rational-basis test. The challenge arises under the Fifth Amendment to the Constitution, which unlike the Fourteenth Amendment, does not contain an express equal-protection provision. Since 1954, however, the Supreme Court has construed the Amendment's guarantee

---

[4] As other courts addressing similar requests post-*Carrillo-Lopez* have concluded, it would be "inappropriate to adopt the factual findings of another court" and "defendant has not explained whether this Court has been presented with the same evidence to be able to draw the same conclusion." *Sanchez-Felix*, 2021 WL 6125407, at *7; *see also Sifuentes-Felix*, 2022 WL 293228, at *3 ("Defendant does not analyze any portion of *Carrillo-Lopez*, nor does he specifically identify what evidence before that court is also before this Court which should persuade the undersigned to wholesale adopt *Carrillo-Lopez*'s 'outlier' analysis.").

of "due process of law" for all "person[s]," U.S. Const. amend. V., to provide analogous protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Court has generally applied the same equal-protection standards in both contexts. *E.g.*, *Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985). But federal immigration laws are an exception to that rule. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217-18 (1995) (citing *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 101-102, n.21 (1976)); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *see also Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972).

"For reasons long recognized as valid," the Supreme Court has explained, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews*, 426 U.S. at 81. Indeed, "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). There is thus a "need for special judicial deference to congressional policy choices in the immigration context." *Fiallo*, 430 U.S. at 793. That is, "[b]ecause decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Mathews*, 426 U.S. at 81); *see also Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (federal government's authority over "immigration and status of aliens"

7

rests in part on "its inherent power as sovereign to control and conduct relations with foreign nations"). "The reasons that preclude judicial review of political questions" thus "also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," *Mathews*, 426 U.S. at 81-82—including congressional enactments that "regulate the admission and exclusion of aliens," *Fiallo*, 430 U.S. at 793 n.5; *see also Hawaii*, 138 S. Ct. at 2420 ("our inquiry into matters of entry and national security is highly constrained").

The Seventh Circuit has equated that narrow standard of review with the rational-basis test. *E.g.*, *City of Chicago v. Shalala*, 189 F.3d 598, 604 (7th Cir. 1999) ("Although the [*Mathews*] Court did not adopt explicitly the 'rational basis' standard of scrutiny, it in effect applied rational basis review, upholding the legislation because it was not 'wholly irrational'") (citations omitted). That test is deferential. The government need not articulate the purpose underlying its policy or "produce evidence to sustain [its] rationality." *Heller v. Doe*, 509 U.S. 312, 320 (1993). A "statute survives rational basis scrutiny 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Shalala*, 189 F.3d at 605 (quoting *Heller*, 509 U.S. at 320).

The Supreme Court and the Seventh Circuit have applied this standard to an array of equal-protection challenges to immigration laws. The Court in *Fiallo*, for example, "underscore[d] the limited scope of judicial inquiry into immigration legislation," before applying minimal scrutiny to a law that drew a gendered distinction by giving special immigration preferences to mothers, but not fathers, of

certain children. 430 U.S. at 792-99. Likewise, in *Robledo-Gonzales v. Ashcroft*, 342 F.3d 667, 682-83 (7th Cir. 2003), the Seventh Circuit applied rational-basis scrutiny to an equal-protection challenge of a regulation precluding aliens who have illegally reentered the United States from applying for discretionary relief under 8 U.S.C. § 1182(c). Those are just examples; the Seventh Circuit has repeatedly applied rational-basis review to equal-protection challenges concerning the INA. *See, e.g.*, *Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) (scheme automatically conferring citizenship on some children born abroad but not others); *Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) (statute providing for humanitarian waiver of deportability for criminal aliens who seek to be admitted to United States but not for criminal aliens being deported from the United States); *Shalala*, 189 F.3d at 603-04 (considering a law that disqualified noncitizens from various welfare programs). And it has applied this same level of scrutiny to an equal-protection challenge involving a federal criminal statute. *United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000) (statute criminalizing otherwise purely domestic hostage taking if any of the offenders are foreign nationals). Each of these decisions reflects the same, well-established proposition: "[c]lassifications that distinguish among groups of aliens are subject to rational basis review." *Robledo-Gonzales*, 342 F.3d at 682.

Section 1326 is such a classification. It does not apply to all noncitizens, but singles out those who have been previously deported and reenter without applying for permission. Section 1326 is, moreover, a part of a "national policy of excluding illegal—especially, previously deported—aliens." *Carlos-Colmenares*, 253 F.3d at

278-79. It is "designed to effectively enforce the immigration laws" by providing a deterrent to successive illegal entry. *United States v. Owolabi*, 69 F.3d 156, 166 (7th Cir. 1995) (quoting *United States v. Baeza-Suchil*, 52 F.3d 898, 900 (10th Cir. 1995)). In other words, "Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). Indeed, as the Seventh Circuit has recognized, the statute implicates the nation's "right to police our borders, and expel immigrants who have been convicted of felonies, [which] is essential to our national security and welfare." *Owolabi*, 69 F.3d at 166; *see also, e.g.*, *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968) (§ 1326 is a "regulatory statute enacted to assist in the control of unlawful immigration by aliens"). As a "decision[ ] made by the Congress" squarely regulating "the area of immigration and naturalization," § 1326 is subject to a "narrow standard of review." *Mathews*, 426 U.S. at 81-82; *accord Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 & n.5 (9th Cir. 2017) (collecting cases from Sixth Circuit, Second Circuit, and Third Circuit).

*Carrillo-Lopez*'s contrary decision was flawed. 2021 WL 3667330, at *2-3. It first reasoned that *Wong v. United States*, 163 U.S. 228, 237 (1896), supports the notion that "greater protections under the Fifth Amendment necessarily apply" when laws entail criminal penalties. 2021 WL 3667330, at *2. *Wong*, however, merely held that certain aliens enjoyed Fifth (and Sixth) Amendment rights, and as a result, they could not be jailed absent trial. 163 U.S. at 238 (invalidating Chinese Exclusion Act's imprisonment provisions). It did not address the correct standard for equal-protection

10

claims under the Fifth Amendment; *Wong* predated by almost 60 years the Supreme Court's application of equal-protection principles to federal action. *See Bolling*, 347 U.S. at 499. And courts, including the Seventh Circuit, have applied rational-basis review to equal-protection challenges under the Fifth Amendment in criminal cases. *See, e.g.*, *Montenegro*, 231 F.3d 389, 395; *United States v. Lue*, 134 F.3d 79, 87 (2d Cir. 1998) (reviewing the same law, which discriminated on the basis of alienage (an otherwise suspect classification), and noting that while noncitizens enjoy equal-protection rights, those are "constrained in light of the responsibility of the political branches to regulate the relationship between the United States and noncitizens").

*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), did not, as *Carrillo-Lopez* asserted, "decline[ ] to adopt the standard advanced by the government" in this context. 2021 WL 3667330, at *2. The question in *Regents* concerned whether the type of selective-enforcement challenge raised was cognizable at all. *See id.* at 1915. The Court assumed—without deciding— that it was, before applying *Arlington Heights* scrutiny and rejecting the equal-protection claim. *Id.* It did not weigh in on the proper standard in an equal-protection challenge to congressionally passed immigration laws.[5]

---

[5] *Carrillo-Lopez* also relied on a Ninth Circuit decision, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), which is not binding on this Court. In any event, *Ramos* distinguished *Hawaii* because it concerned "foreign nationals who have lawfully resided in the United States for some time." 975 F.3d at 896. That cannot be said of defendant or many others subject to § 1326. And the Court's reasoning in cases beyond *Hawaii*—including *Mathews* and *Fiallo*—dictate rational-basis review here.

*Carrillo-Lopez* also mistakenly distanced itself from Supreme Court precedent by suggesting that judicial deference depends on whether the regulation in question concerns who is allowed to enter the country. 2021 WL 3667330, at *3 (distinguishing § 1326 from a policy "addressing national security concerns of those not within the United States"); *see also Machic-Xiap*, 2021 WL 3362738, at *9. Section 1326 *is* such a regulation. It prohibits entry by a certain class of people: those who have been deported and lack authorization to reenter. *See, e.g.*, *Carlos-Colmenares*, 253 F.3d at 278-79 (§ 1326 "exclude[s]" certain aliens). And regardless, the Supreme Court and Seventh Circuit have applied the standard even when the challenge, like the present one, concerns alleged discrimination against those already present in the United States. *See, e.g.*, *Mathews*, 426 U.S. at 69 (suit by "resident alien[s]"); *Fiallo*, 430 U.S. at 792-99; *see also id.* at 802-04 (explaining that a petitioner was a citizen who had been discriminated against on the basis of his gender) (Marshall, J., dissent); *Shalala*, 189 F.3d at 604 (suit involving legal permanent residents).

Finally, *Carrillo-Lopez*'s reliance on *Cook County, Illinois v. Wolf*, 461 F. Supp. 3d 779, 788-89 (N.D. Ill. 2020), is misplaced. 2021 WL 3667330, at *3 n.6. *Wolf* concerned a challenge to an agency's interpretation of a statute that the agency defended "solely on economic grounds," making it distinguishable from the facts in *Hawaii*. 461 F. Supp. 3d at 789. This case, on the other hand, involves a challenge to a congressionally passed statute that is "a necessary piece of the immigration-regulation framework." *Hernandez-Guerrero*, 147 F.3d at 1078.

Applying rational-basis review, § 1326 easily passes that test. The relevant question is whether "there is a rational relationship" between the "disparity of treatment" associated with the challenged provision and "some legitimate governmental purpose." *Shalala*, 189 F.3d at 605 (quoting *Heller*, 509 U.S. at 320). There can be no reasonable question that deterring illegal reentry is a legitimate government interest or purpose under the rational-basis standard. *See Hudson v. United States*, 522 U.S. 93, 105 (1997) (calling deterrence "a traditional goal of criminal punishment"). As the Seventh Circuit has explained, the "United States has a legitimate interest in seeing that individuals who cross their borders do so legally and in accordance with set procedures" and a "corollary interest in deterring individuals from crossing its borders illegally." *Robledo-Gonzalez*, 342 F.3d at 683.

Section 1326 is rationally designed to advance that legitimate interest in deterring illegal reentry. *Carlos-Colmenares*, 253 F.3d at 278-79. "[W]ithout the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078. As every district court to apply rational-basis review to analogous challenges has held, § 1326 is constitutional under that standard.[6]

## II. Defendant's Challenge Fails Under the *Arlington Heights* Standard.

Defendant's challenge alternatively fails under the *Arlington Heights* standard for which he advocates. Claims based on disparate impact alone are not cognizable

---

[6] *See, e.g.*, *Maurico-Morales*, 2022 WL 99996, at *1; *Amador-Bonilla*, 2021 WL 5349103, at *1; *Samuels-Baladayaquez*, 2021 WL 5166488, at *2; *Novondo-Ceballos*, 2021 WL 3570229, at *4; *Rivera-Sereno*, 2021 WL 5630728, at *4.

under the Equal Protection Clause; "[p]roof of racially discriminatory intent or purpose is required." *Arlington Heights*, 429 U.S. at 265; *see Washington v. Davis*, 426 U.S. 229, 239-42 (1976). Where, as here, the challenged law is neutral on its face, courts perform the "sensitive inquiry" set forth in *Arlington Heights*. 429 U.S. at 266.

Under *Arlington Heights*, "[t]he impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Id*. at 266 (quotation marks and citation omitted). But outside of extreme circumstances not alleged here, disparate "impact alone is not determinative," and courts must assess other evidence in deciding whether a racially discriminatory purpose was "a motivating factor in the decision." *Id*. at 265-66. Pertinent evidence includes "[t]he historical background of the decision," "[t]he specific sequence of events leading to" it, "departures" from "[s]ubstantive" or "procedural" norms, and "[t]he legislative and administrative history . . . , especially . . . contemporary statements by members of the decisionmaking body." *Id*. at 267-68. The challenger has the burden of establishing discriminatory intent. 429 U.S. at 265-68. If he bears that burden, it shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id*. at 270 n.21.

Discriminatory motive has a particular meaning in the equal-protection context. A challenger must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

14

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That standard requires more than proof that the legislature had "awareness of [the] consequences" for the affected group or that those consequences were "foreseeable*." Id.* at 278-79; *see also Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020).

### A. Defendant Cannot Establish Discriminatory Intent in the Passing of § 1326.

Defendant has been indicted for violating § 1326, not the 1929 Act. As to § 1326, he has not established that Congress acted with discriminatory intent in passing that statute in 1952 and later amending it. He relies exclusively on *Carrillo-Lopez*, which in turn relied on a separate statutory provision, executive-branch statements unrelated to § 1326, and extrinsic historical events to conclude that § 1326 must have been passed with racial animus. 2021 WL 3667330, at *10-16. This threadbare theory does not pass muster under the *Arlington Heights* standard, as courts have repeatedly concluded.[7]

As the Supreme Court has recognized, proving discriminatory intent "is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Analyzing the intentions of a local and contemporary body is one thing, *see Arlington Heights*, 429 U.S. at 265; but proving the "actual motivations of the various legislators that produced a given decision" is more difficult—especially where, as here, that decision occurred 70 years ago, and was made by hundreds of legislators from both

---

[7] *See Muñoz-De La O*, 2022 WL 508892, at *14; *Hernandez-Lopez*, 2022 WL 313774, at *6; *Sanchez-Felix*, 2021 WL 6125407, at *7; *Machic-Xiap*, 2021 WL 3362738, at *11-14; *Wence*, 2021 WL 2463567, at *9.

sides of the aisle and from across the country. *See Hunter*, 471 U.S. at 228.[8] For that reason, the Supreme Court has resisted when "asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). Selected statements are not generally representative of all majority-voting legislator's intentions, "and the stakes are sufficiently high for" the courts "to eschew such guesswork." *Id.*

In this case, the INA "represents the final product of a most intensive and searching investigation and study over a three[-]year period." *Pena-Cabanillas*, 394 F.2d at 790. It entailed a near-thousand-page committee report, substantial floor debate, and was passed by two-thirds of the 82nd Congress over a presidential veto. Despite that long record, and as the historians on whom *Carrillo-Lopez* relied have testified, "the legislative history of the INA was largely free of explicitly racist expressions." *Machic-Xiap*, 2021 WL 3362738, at *13 (citing Professor Kelly Lytle Hernandez's and Professor Benjamin Gonzalez O'Brien's testimony); *Hernandez-Lopez*, 2022 WL 313774, at *4 (same). Defendant nevertheless asks this Court to engage in the "guesswork" of inferring the 82nd Congress's intent from a handful of episodes peripheral to § 1326's passing. *O'Brien*, 391 U.S. at 384. This Court should not assign invidiousness to a Congress under such speculative circumstances.

---

[8] In *Hunter*, the Supreme Court concluded that plaintiffs had established discriminatory intent in challenging an Alabama disenfranchisement constitutional provision that was enacted during an explicitly white-supremacist convention and still on the books; indeed, the state had conceded that race was a factor in its passing. 471 U.S. at 229-230. This case presents no such compelling evidence.

*Carrillo-Lopez*, for example, relied on President Truman's veto of the INA. 2021 WL3667330, at *12. That veto noted that "certain provisions" met the President's approval, adding that the INA was a "long and complex piece of legislation." Statement of Pres. Trum., *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality* (June 25, 1952) (attached as Exhibit D). The veto explained, however, that the proposed INA "would perpetuate injustices long standing" and "intensify the repressive and inhumane aspects of our immigration procedures." *Id.* According to *Carrillo-Lopez*, those comments put Congress on notice that § 1326 was invidious. 2021 WL 3667330, at *12. But President Truman's veto mentioned neither § 1326 nor the impact on Mexican or Latinx individuals. To the contrary, it addressed an objection to the INA's maintenance of certain parts of the national-origin quota system, to which North Americans were not even subject. *See* Ex. D; *see also Carrillo-Lopez*, 2021 WL 3667330, at *12; *Machic-Xiap*, 2021 WL 3362738, at *13.

Section 1326, by contrast, was uncontroversial. *Accord United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but §§ 1325 and 1326 were not among the debated sections."). Even Senate opponents of the version of the INA that passed gave no pause to § 1326. *See* Joint Statement by Sponsors of New Omnibus Immigration and Naturalization Bill – Senators Humphrey, Lehman, Benton, Langer, Kilgore, Douglas, McMahon, Green, Pastore, Murray, Kefauver, Morse, and Moody, 82 Cong. Rec. 2141-2143 (Mar. 12,

1952) (attached as Exhibit E). And the competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic (*see, e.g.*, 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman))—contained an illegal-reentry law identical to what became § 1326. *See* S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952) (excerpt attached as Exhibit F). The veto, therefore, did not highlight for Congress the alleged racism of an illegal-reentry law. It concerned ongoing debates ancillary to the uncontested § 1326, and as such, provides no evidence of the 82nd Congress's discriminatory intent in passing that law.

*Carrillo-Lopez* also cited the purported "silence" of the 82nd Congress in passing § 1326 as indicative of animus. 2021 WL 3667330, at *11. That position defies the general rule against "[d]rawing meaning from [Congressional] silence." *Kimbrough v. United States*, 552 U.S. 85, 103 (2007). But even setting aside that principle, there was nothing out of the "[s]ubstantive" or "procedural" norm in the passage of the uncontroversial § 1326. *Arlington Heights*, 429 U.S. 267-68. Congress passed § 1326 law following "a full and complete investigation of our entire immigration system." S. Rep No. 81-1515 (Ex. B), at 803. The Senate Judiciary Committee's report specifically addressed the criminal reentry and harboring laws, noting concerns that commentators and witnesses had with the enforcement of those laws, and explaining the Committee's position that "a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the problem." S. Rep. No. 81-1515 (Ex. B), at 654-55. After further explaining that "different sections of the country are not all faced with the same problems" but that the Committee "must

concern itself with laws which apply equally to all sections of the country," the Committee recommended the illegal-entry provision with certain penalty adjustments. *Id.* at 655-56.

Following the Committee's review, Congress substantially altered reentry law with § 1326. It added the "found in" clause now in § 1326(a) to address venue-related issues in previous prosecutions. *See* Ex. C. In doing so, Congress created a "substantive offense[ ]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999). Notably, *that* offense—for being "found in" the United States, which was not made illegal until 1952—is the offense with which defendant has been charged. R. 10. And the 82nd Congress made other changes, too. It made § 1326 serve as a single illegal-reentry statute that applied the same penalties, repealing other provisions that had prescribed different penalties for defendants deported for subversive or immoral activities. *See* INA § 403, 66 Stat. 279-80; S. Rep. No. 81-1515 (Ex. B), at 646-47, 655-56 (1950); *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 & n.10 (1987). In addition, Congress (1) changed the reentry prohibition to reach those "excluded and deported," not just those "arrested and deported," INA § 276, 66 Stat. 229; (2) omitted a phrase in the 1929 Act ("in pursuance of law") that the Supreme Court later identified as a potential textual basis for allowing defendants to challenge the validity of their deportation orders in an illegal-reentry prosecution, *see Mendoza-Lopez*, 481 U.S. at 836; and (3) added language "except[ing] those aliens who have either received the express consent of the Attorney General to

19

reapply for admission or who otherwise establish that they were not required to obtain such consent," *id.* at 831 n.2.

*Carrillo-Lopez* overlooked these aspects of the new § 1326 Congress passed in 1952, but they belie the claim that § 1326 was passed in "silence." Neither defendant nor *Carrillo-Lopez* cited a single legislator—or even then-contemporary commentor—who disputed the appropriateness of a crime prohibiting illegal reentry. As noted, even the INA's opponents took no issue with what became § 1326. It follows that the provision did not require thorough debate.

The letter written by Deputy Attorney General Peyton Ford (who was not a member of Congress) does not help defendant. *Carrillo-Lopez*, 2021 WL 3667330, at * 13; *see* Ex. C. The term "wetback" appeared in a portion of Ford's letter wholly unrelated to § 1326, in which Ford block-quoted paragraphs of a report of *President Truman's* Commission on Migratory Labor discussing immigration officers' authority to enter onto private property. Ex. C. at 9. *Carrillo-Lopez* also erroneously read the letter to "recommend[ ]" adding the found-in clause to § 1326. 2021 WL 3667330, at *13. Ford did not propose the "found in" clause; rather, he wrote in "response" to the Senate Committee's request for the Justice Department's views on a draft bill that already contained the clause. *See* Ex. C. at 7 (noting that the proposed version of INA § 276 Ford was asked to review "adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States"). Read in its proper context, the Ford letter does not advance defendant's argument.

*Carrillo-Lopez* further relied upon a separate law, the anti-harboring provision colloquially referred to by some as the "Wetback Bill." 2021 WL 3667330, at *14-15. That provision, passed two months before the INA, did not target noncitizens; it targeted those who facilitated noncitizens' entry and residence in the United States, but exempted employers. *See* Pub. L. No. 82-283, 66 Stat. 26 (1952) ("An Act To assist in preventing aliens from entering or remaining in the United States illegally"), codified as amended at 8 U.S.C. § 1324(a). Congress enacted the anti-harboring provision to strengthen immigration enforcement in light of *Mexico*'s concerns about the implementation of a work program between Mexico and the United States. *Id.*; 82 Cong. Rec. 795 (1952) (statement of Hon. Allen J. Ellender) ("The enactment of this amendment is necessary, I understand, because the Mexican Government refuses to enter into another contract pursuant to existing law unless we strengthen our immigration laws."). *Carrillo-Lopez*, however, saw racism in the "incongruities between the stated intent of the bill and the actual language of the bill." 2021 WL 3667330, at *14. But it is hard to see how. Even if the employer exemption was meant as some consolation to farmers, the anti-harboring provision explicitly prohibited aiding unauthorized entries. And even aside from that context, how some unspecified number of representatives described a different bill says little about the legislature's motivations for passing § 1326. *See Sanchez-Felix*, 2021 WL 6125407, at *7; *Wence*, 2021 WL 2463567, at *7.[9]

---

[9] *Wence* addressed the related "wetback amendment," which proposed measures to curb illegal entry. 2021 WL 2463567, at *7-8. That amendment was voted down 65-11, 82 Cong.

The scant citations to lawmakers' use of derogatory terms unconnected to § 1326 fall well short of establishing that animus was a motivating reason for that statute. *O'Brien*, 391 U.S. at 384. With respect to what the 82nd Congress actually did, defendant's challenge is based only on claims that "the statute was passed hastily," "the alleged racial imagery contained in a few documents introduced into the Congressional Record," and "contemporaneous utterances of some legislators." *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994). These "scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress." *Id.*

### B. Defendant's Attempt to Impute the 70th Congress's Intent on the 82nd and Later Congresses Is Inconsistent with the Historical Record and Supreme Court Precedent.

Unable to demonstrate persuasively Congress's discriminatory intent, *Carrillo-Lopez* spent much attention on the 1920s. According to it, the rise of eugenics in that decade, agribusiness's desire for Mexican labor, border practices, and racist comments made by some lawmakers and others demonstrate that the 1929 Act was intentionally discriminatory. 2021 WL 3667330, at *7-10. Those historical episodes and comments do not speak for the majority voters in the 70th Congress, and they certainly cannot be imputed to the 82nd Congress or later Congresses.

---

Rec. 8123 (June 26, 1952), and every senator who argued for the amendment voted against the veto override that passed the INA. 2021 WL 2463567, at *7-8.

*Carrillo-Lopez* also cited the 82nd Congress's supposed "awareness" of disparate impact. 2021 WL 3667330, at *15-16. That argument is addressed *infra* in Section III.

*Carrillo-Lopez*'s depiction disregards the obvious and valid reasons for prohibiting reentry after deportation. It ignores, for example, the Senate Report preceding the 1929 Act, which provided the rationale for the new reentry law: then-existing legislation provided no penalty for reentry "other than repeated deportation" for most noncitizens, and it is "academic that no prohibitive law" can succeed without a deterrent. S. Rep. No. 70-1456 (Ex. A), at 1-2. That report further quoted James Davis of the Labor Department, for the proposition that "[m]any of the aliens who are required to be deported enter as seamen" who must be deported "aboard regular passenger steamers"—reflecting a concern about non-North American noncitizens, not Mexicans. *Id.* at 2; *see also* H.R. Rep. No. 70-2418. To be sure, *Carrillo-Lopez* and the historians on which it relied spotlighted comments ranging from troubling to vile made by a handful of legislators and others in the 1920s discussing various immigration proposals, such as quotas and deportation. The Supreme Court, however, has cautioned against this very approach to derive motives on the part of an entire legislature. *Hunter*, 471 U.S. at 228; *O'Brien*, 391 U.S. at 384. The statements and sentiments cited are insufficient to establish a motivating, invidious purpose behind the 435-member Congress's decision to pass a reentry law that had an obvious, legitimate rationale.

But the Court need not resolve that question. Courts may consider the "historical background" to challenged legislation, but the intent of the Congress that enacted the legislation at issue is the one that matters. *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality). For that reason, proof of predecessor's intent is,

23

standing on its own, necessarily insufficient. As the Supreme Court has put it, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id*. What is more, even in considering such evidence, "distant instances of official discrimination in other cases are of limited help," *id.*, and its probative value decreases with time and by context, *see Regents*, 140 S. Ct. at 1916; *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), or when it is attributable to a legislature with "a substantially different composition," *Brnovich v. DNC*, 141 S. Ct. 2321, 2349, n.22 (2021) (quotation marks omitted).

The Supreme Court elaborated on these principles in *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). *Abbott* involved a 2013 districting plan enacted by the Texas legislature after its original 2011 plan was challenged in two courts. *Id*. at 2316-17. Although the legislature adopted the 2013 plan from a version preliminarily approved by a three-judge court, that same court later invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id*. at 2318. The Supreme Court reversed. In so doing, the Court reaffirmed that discriminatory purpose must be shown as to the actual law being challenged, not the predecessor; the legislature that enacted the successor statute is generally afforded a presumption of good faith; a finding of past discrimination does not "flip[] the evidentiary burden" to the government to prove that the successor statute is free from discriminatory intent, *id*. at 2324-25; and a successor legislature does not have a "duty to expiate its predecessor's bad intent." *Id*. at 2325; *see id*. at 2326 n.18.

24

*Carrillo-Lopez* repeated the error corrected in *Abbott* in arguing that Congress needed to "cleanse" and "confront" the alleged animus of 1929 in enacting and amending § 1326. By focusing on the intent of the 1929 Congress, defendant attempts to "flip[ ]" the evidentiary burden onto Congress to show it was not acting discriminatorily. *Abbott* rejected that view: there is no "duty to show" that a legislature "purged the bad intent of its predecessor." *Abbott*, 138 S. Ct. at 2326 n.18.

*Carrillo-Lopez* misinterpreted *Abbott* in concluding that the Court left room for its "cleansing" theory. 2021 WL 3667330, at *9. *Abbott* underscored that the challenger must prove animus on the *enacting* legislature's part. 138 S. Ct. at 2324-25. It disclaimed the idea that previous discrimination can act as an "original sin" against later legislatures. *Id.* (citing *Mobile*, 466 U.S at 74). And it did not suggest that challengers could bootstrap a preceding legislature's motivations onto a current one so long as the latter "reenacted" the challenged law. *Abbott*'s comments about a "reenact[ment]" concerned what the Texas legislature *could* have done in 2013 but did not do—after the 2011 plan was challenged as discriminatory and reworked by the courts, reenact it as it was anyway. *Id.* ("The 2013 Texas Legislature did not reenact the plan previously passed."). Given that context, *Abbott* cannot be read to embrace the sweeping notion that a new legislature's intent can be inferred principally on a previous one's discrimination, especially absent evidence that the new legislature was aware of the discrimination.

To hold otherwise "establishes an insurmountable burden" for legislatures. *Johnson v. Governor of the State of Florida*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005)

(en banc). As the Eleventh Circuit, sitting en banc, explained in *Johnson*, it would be difficult for legislatures to "extinguish" such past discrimination because, with the passage of time, it is "unlikely that the present day legislators would be aware of the past discrimination" that supposedly taints the specific law. *Id.* As a result, *Johnson*, like *Abbott*, declined to require the legislature to "demonstrate that it acknowledged" the "racial discrimination [that] tainted" the earlier law. *Id.* at 1225; *see also Johnson*, 40 F.3d at 440 (in a challenge to a 1986 law's crack-cocaine disparity, dismissing as "irrelevant" the "undeniable racism" surrounding cocaine's criminalization in 1914 as an "anomalous attempt to tar the present Congress with the racist brush of a pre-World War I debate").

This Court should hold the same. Unlike in *Abbott*, congressional notice of previous discrimination cannot be assumed. Twenty-three years had passed between the supposed animus in 1929 and the enactment of § 1326, and almost 70 years passed between 1929 and § 1326's most recent amendment. *See McCleskey*, 481 U.S. at 298 n.20. Between 1929 and 1952, there had been a 94-percent turnover in congressional membership.[10] *Brnovich*, 141 S. Ct. at 2349 n.22. Despite the long legislative history surrounding the INA, neither defendant nor *Carrillo-Lopez* cites any compelling evidence that Congress was *actually* aware of the alleged

---

[10] *Compare 70th Congress (1927-1929): Congress Profiles,* History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/70th/ *with 82nd Congress (1951-1953): Congress Profiles*, History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/82nd/ (reflecting overlap of only twenty-six members, or approximately 6% of the 82nd Congress).

discriminatory intent of the 1929 illegal-reentry law. *Carrillo-Lopez* cited the supposed fact that Congress was likely "aware" of an illegal-reentry law's disparate impact, 2021 WL 3667330, at *15-16, but that does not come close to establishing that it knew of animus. *Accord Regents*, 140 S. Ct. at 1915-16. As a result, the enactors and amenders of § 1326 cannot be cast with the alleged "original sin" of their predecessors. *Abbott*, 138 S. Ct. at 2324-25 (quoting *Mobile*, 466 U.S at 74).

What is more, even if *Carrillo-Lopez* were correct (and it was not) in believing that the good-faith presumption applies only when successor laws are "substantially altered," 2021 WL 3667330, at *10, the 82nd Congress made such changes. As described earlier, Congress added the found-in clause—under which defendant has been charged—and made other changes to the law as well, as have subsequent Congresses. *See supra* at 19-20.

The *Arlington Heights* framework already accounts for the "historical background" of a law in assessing its constitutionality, 429 U.S. at 267-68, subject to the enacting legislature's good-faith presumption and the limits described in *Abbott*, *Mobile*, and other cases. This Court should reject the attempt to expand the relevance of the 1929 Act beyond what it can be assigned under *Arlington Heights* and impose an already-rejected duty to purge alleged, decades-old animus.

## C. Section 1326's Impact on Mexican and Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent.

Defendant argues that § 1326 has a disparate impact on Mexican and Latinx individuals. Mot. at 5-6. Even if that is true, it is not persuasive evidence that Congress enacted the statute with racial animus. *Arlington Heights* requires proof

that Congress enacted the law "because of" a disparate impact, not "in spite of" it. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Defendant's statistics do not show such intent.

As an initial matter, defendant fails to cite any meaningful evidence § 1326 has a disparate impact on Mexican and Latinx individuals. He notes, for example, that 89 percent of "apprehensions" in 2020 were of Mexican and Latinx individuals. Mot. at 5. This case, however, concerns unlawful-reentry prosecutions. In any event, that a high number of those prosecuted under § 1326 are Mexican or Latinx is not surprising; in 2019 north of 90 percent of all deportees hailed from countries in North and South America that were not Canada or the United States.[11] In other words, the statistics suggest that § 1326 is being applied proportionally by nationality. Yet even assuming that there is a disparate impact, the fact that Mexican and Latinx individuals make up the bulk of § 1326 prosecutions is not evidence of discriminatory intent.

*Regents* is instructive. Eight Justices in that case addressed an argument similar to defendant's on behalf of beneficiaries of the deferred-action immigration program. The beneficiaries argued that the disparate impact of the program's rescission on "Latinos from Mexico, who represent 78% of" the program's beneficiaries, supported an inference that the rescission was driven by a

---

[11] *See* DHS, 2019 Yearbook of Immigration Statistics, Table 41, available at https://www.dhs.gov/immigration-statistics/yearbook/2019/table41 (last visited Apr. 1, 2022) (showing that, of 359,885 removals, 336,824 had a North American nationality, and only 854 were from Canada; 215,205 were from Mexico; 53,180 were from Guatemala; 40,751 were from Honduras; and 18,190 were from El Salvador).

discriminatory purpose. 140 S. Ct. at 1915-16 (plurality); *id*. at 1919 n.1 (Thomas, J., concurring in part and dissenting in part); *id*. at 1936 (Kavanaugh, J., concurring in part and dissenting in part). The Court's plurality opinion rejected that claim. It explained that the disparity did not, "either singly or in concert" with other factors, make out a "plausible equal protection claim." *Id*. at 1915. The opinion reasoned that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program." *Id*. And "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id*. at 1916.

*Regents* reflects the sensible proposition that outsized effects on certain populations are an expected byproduct of broad-based immigration regulations, and such effects are not enough to prove discrimination. And that principle applies squarely to defendant's challenge to § 1326. Because a disproportionate share of the individuals excluded or removed from the United States are Mexican or Latinx, it stands to reason that a high share of those prosecuted for illegally returning after removal will likewise be Latinx. That is all the more true when taking into account the proximity of the United States to Mexico and Central America, and the possibility of returning to the United States from those locations over land. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1080 (9th Cir. 2003) (explaining, in the context of a selective prosecution claim, the "common sense" notion "that it would be substantially

more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so").

Cases outside of the immigration context similarly conclude that uneven impact does not usually mean animus. The Seventh Circuit in *Conley v. United States*, 5 F. 4th 781 (7th Cir. 2021), for example, addressed an equal-protection challenge to convictions based on a "fake stash house" robbery sting. The Court concluded that the "awareness" that Black individuals would be subject to the sting "does not prove purposeful discrimination," absent "other evidence indicating" that the aim was to target Black people. 5 F.4th at 798. Similarly, multiple courts of appeals have rejected equal-protection challenges to crack-cocaine distribution convictions under the *Arlington Heights* standard. Those decisions reason that the "disproportionate impact on African Americans" and Congress's awareness of that disparate impact was insufficient to prove discriminatory intent. *United States v. Dumas*, 64 F.3d 1427, 1429-30 (9th Cir. 1995); *see also United States v. Coleman*, 24 F.3d 37, 39 (9th Cir. 1994); *Johnson*, 40 F.3d at 440 ("intent . . . requires more than knowledge of consequences").

*Carrillo-Lopez* cited statistics from the 1930s to argue that Congress in the 1950s was actually aware of the reentry law's disparate impact. 2021 WL 3667330, at *15. Yet even if the 1952 Congress had been aware of any purported disparate impact, defendant still would be required to show the 1952 Congress was motivated in no small part *because* of the reentry prohibition's adverse effect on Mexican and Latinx defendants. He has not done so.

### III.    In Any Event, Congress Would Have Passed § 1326 Absent the Alleged Animus.

Even if defendant had met his burden under *Arlington Heights* (and he has not), it is apparent that Congress would have passed § 1326 absent any animus. Two main considerations confirm that the government can carry that burden here.

The first is the obviously valid federal-immigration objectives served by an illegal-reentry law. The Supreme Court has recognized that cases exist "in which— notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275. This is such a case. Imposing a sanction on those who repeatedly violate U.S. immigration laws (and territorial boundaries) is a basic and legitimate feature of a controlled border. *See supra* at 9-11; *cf. United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) (recognizing the "inherent authority" of the government as sovereign "to protect, and [its] paramount interest in protecting, its territorial integrity"). And nothing suggests that Congress, which was aware of the need for a deterrent a century ago, *see* S. Rep. No. 70-1456 (Ex. A), would forgo such a law decades later.

Second, Congress's repeated amendments to Section 1326 make plain that Congress would have enacted an illegal-reentry statute irrespective of any allegedly improper motives that existed in 1929. Congress has amended Section 1326 five times since enacting it as part of the INA's immigration overhaul in 1952, and defendant does not allege that these subsequent Congresses harbored any discriminatory intent. These repeated amendments reflect Congress's ongoing attention to the law, and its continued judgment that the illegal-reentry statute is an appropriate part of our

immigration-regulation framework. That Congress has repeatedly considered, amended, and approved the illegal reentry statute demonstrates that the law would exist in the absence of the discriminatory intent that defendant claims existed nearly a century ago. *Arlington Heights*, 429 U.S. at 270 n.21.

## CONCLUSION

For these reasons, the Court should deny defendant's motion to dismiss.

Dated: April 1, 2022

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     /s/ *Thomas P. Peabody*
Thomas P. Peabody
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 353-4307