# Exhibit B

tion of the Commissioner of the Immigration and Naturalization Service.

### l. Recommendations

It is recommended that the revised law contain provisions which permit the release or admission of aliens under bond in the discretion of the Commissioner. It is further recommended that no change be made which would permit an excluded alien to be admitted under bond.

## D. IMMIGRATION OFFENSES

### 1. PURPOSE AND CLASSIFICATION

The exclusion and deportation statutes accomplish the basic purposes of our immigration laws to keep out of the United States aliens who should not be admitted and to deport those who enter the United States or remain here contrary to law.

In order to strengthen materially the effective administration and execution of the immigration laws, there are many provisions which involve penalties designed to aid in their enforcement. The smuggling of aliens into the United States, perjury and fraud practiced in entering the United States, and the bringing of inadmissible aliens to the United States by transportation companies are among the many violations for which Congress has provided penalties in addition to exclusion or deportation.

Penal provisions now in force may be divided into three classes: (1) Penalties imposed judicially for the commission of crimes; (2) penalties recoverable in civil judicial proceedings; and (3) penalties recoverable in administrative proceedings.

### 2. PENALTIES IMPOSED JUDICIALLY FOR THE COMMISSION OF CRIMES

#### a. Illegally importing, landing, or harboring aliens

##### (1) Smuggling and harboring smuggled aliens

The most important and the most used penal provision of the immigration laws relating to the smuggling of aliens and the harboring of smuggled aliens is section 8 of the Immigration Act of 1917.[38] This section covers all phases of smuggling and makes it a misdemeanor for any citizen or alien to bring into or assist in bringing into the United States by any means, or to conceal, harbor, or attempt to do so, any alien not duly admitted or not lawfully entitled to enter the United States. The punishment is a fine not to exceed $2,000 and imprisonment for not more than 5 years for "each and every alien so landed or so brought in or attempted to be landed or brought in." It was contended that this language does not prescribe a penalty for the illegal harboring of aliens as distinguished from the illegal bringing into the United States of aliens. This view was accepted by the United States Supreme Court which held that the deficiency in the statute could not be supplied.[39]

##### (2) Importing prostitutes

Section 4 of the Immigration Act of 1917[40] is directed against one who assists in bringing to this country aliens of the immoral class. The

---

section makes it a felony for anyone to import or attempt to import an alien for the purpose of prostitution or for any other immoral purpose. It is also a crime for anyone to hold any alien for such purposes in pursuance of such illegal importation or to keep an alien so brought into the United States in a house of prostitution. Since this is considered a more serious offense than that described in section 8, the penalty imposed is imprisonment for not more than 10 years and a fine of not more than $5,000.

##### (3) Aiding radicals to enter the United States

Section 28 of the act of 1917[41] makes it a felony for anyone knowingly to aid or assist an anarchist or other of the radical group, including those who believe in or advocate the forceful overthrow of the Government of the United States, to enter the United States or to conspire or connive with another to aid or permit an alien of this class to enter the United States. The penalty is a fine of not more than $5,000 or imprisonment for not more than 5 years, or both. This section makes it a misdemeanor for anyone knowingly to aid an alien who advocates or teaches the destruction of property to enter the United States. The penalty is a fine of $1,000 or imprisonment for not more than 6 months, or both.

##### (4) Improper landing of aliens by carrier from Canada or Mexico

The first proviso to section 23 of the Immigration Act of 1917 requires transportation lines engaged in carrying alien passengers from Canada or Mexico to the United States, either by land or water, to provide suitable landing stations conveniently located at the point or points of entry. Any transportation line which fails to comply is considered to have violated the provisions of section 8 of the 1917 act, previously discussed.

#### b. Illegal inducements and solicitations

##### (1) General

The penal provisions in this category are rarely violated today and are of comparatively little importance. The first attempt of Congress to prevent the importation of cheap labor was not by excluding aliens who were coming to the United States pursuant to a contract of employment but by a law which made it a crime for anyone to import or bring into the United States contract laborers. The following provisions of law are interesting historically even if they are not important today from the standpoint of the number of violations. The purpose was to reduce, numerically, immigration of the cheap laboring class to the United States.

##### (2) Importing contract laborers

A contract laborer, described in section 3 of the Immigration Act of 1917[42] is inadmissible to the United States. As a further means of preventing aliens of this class from entering the United States, section 5 of the Immigration Act of 1917[43] makes it unlawful to encourage aliens to come to the United States by an offer of employment unless the alien is admissible to the United States notwithstanding such offer. Either of two penalties may be imposed. A civil

---

[38] 39 Stat. 874; 880; 8 U. S. C. 144.
[39] United States v. Evans, 333 U. S. 483 (1948).
[40] 39 Stat. 874, 878-879; 8 U. S. C. 138.

[41] 39 Stat. 874, 895; 8 U. S. C. 163.
[42] 39 Stat. 874, 875-878; 8 U. S. C. 136.
[43] 39 Stat. 874, 879; 8 U. S. C. 139.

penalty of $1,000 may be collected in judicial proceedings for each offense or the person violating the section may be criminally prosecuted for a misdemeanor and punished by a fine of not more than $1,000 or imprisonment for not less than 6 months nor more than 2 years.

### (3) Foreign advertisements for laborers

Supplementing section 5, just discussed, section 6 of the Immigration Act of 1917 [44] makes it unlawful to advertise abroad for labor to come to the United States. The civil or criminal penalty prescribed by the above section 5 is applicable.

### (4) Inducement or solicitation of immigration

Section 7 of the Immigration Act of 1917 makes it unlawful for any person or organization engaged in transporting aliens to or within the United States in any way to encourage any alien to come to the United States. A civil or criminal penalty, or both, prescribed in section 5 is applicable. Since the quota-limitation acts, the practical need for this section has disappeared.

### c. Illegal entry

#### (1) Introduction

The foregoing provisions of law are all aimed at persons, citizens or aliens, individuals or corporations, bringing aliens to the United States illegally, inducing aliens to come to the United States, or harboring aliens in the United States after having brought them in contrary to law. Insofar as these sections are concerned, the alien who may have entered the country in violation of law is not himself criminally responsible although others may be criminally prosecuted because of such illegal entry. The following provisions of the immigration statutes impose criminal penalties on an alien for illegally entering the country or for other unlawful acts concerned with an effort to enter illegally:

#### (2) Illegal entry

Section 2 of the act of March 4, 1929, [45] makes it a misdemeanor for any alien to enter the United States at other than the place designated by immigration officials, to elude inspection, to obtain entry by willfully, false, or misleading representations, or by willful concealment of material facts. The penalty is imprisonment for not more than 1 year or a fine of not more than $1,000, or both. This was the first provision of law which made the act of illegally entering the United States a criminal offense and is the most widely used of all the criminal provisions of the law.

#### (3) Illegal entry after deportation

While section 2 of the act of March 4, 1929, makes every illegal entry of an alien a misdemeanor, section 1 of the same act [46] makes it a felony for any deported alien who has not received permission to reapply for admission to enter or attempt to enter the United States. The penalty is imprisonment for not more than 2 years or a fine of not more than $1,000, or both, provided a different penalty is not

[44] 39 Stat. 874, 879; 8 U. S. C. 142.
[45] 45 Stat. 1551; 8 U. S. C. 180 (a).
[46] 45 Stat. 1551; 46 Stat. 41; 8 U. S. C. 180.

expressly provided by law. The proviso here is added so that there will be no conflict with the following two provisions of law.

### (4) Reentry of aliens deported as prostitutes or on like grounds

The previous discussion of section 4 of the Immigration Act of 1917 [47] was confined to the importation of aliens for prostitution and other immoral purposes. The same section also provides that any alien who, after deportation as a prostitute, procurer, or on other like grounds, thereafter enters the United States or attempts so to enter, is guilty of a misdemeanor and is punishable by imprisonment for not more than 2 years. Imprisonment is the only punishment, while a fine without imprisonment may be imposed for violation of the act of March 4, 1929.

### (5) Reentry of aliens deported as radicals

Also punishing the alien for entry or attempting entry after exclusion or deportation for specific reason is section 3 of the act of 1918, which makes it a crime for an alien who has been excluded or deported as a radical under the act of 1918 [48] thereafter to reenter the United States or attempt to do so. This is a felony and the punishment is imprisonment for a term of not more than 5 years.

### d. False statements and fraudulent documents

#### (1) Introduction

The right of an alien to enter the United States today is determined in great measure by documents. The authentic nature and genuineness of such documents must be protected and it is, therefore, appropriate that false statements in documents be punished as a crime. Likewise, the usual weight which may be accorded a sworn statement can only be measured by making false testimony under oath a crime. The following penal provisions of law have been provided for these purposes.

#### (2) Perjury

Section 16 of the act of February 5, 1917, authorizes immigrant inspectors to administer oaths and to take evidence touching the right of any alien to enter, reenter, pass through, or reside in the United States. It then provides that any person to whom such an oath has been administered who knowingly or willfully gives false evidence or swears to any false statement in any way affecting, or in relation to, the right of any alien to admission, readmission to, or to pass through or reside in the United States, shall be deemed guilty of perjury and punished as provided in the statute [49] which defines perjury and prescribes the punishment therefor as a fine of not more than $2,000 and imprisonment for not more than 5 years.

#### (3) False personation

Section 22 of the Immigration Act of 1924 covers many offenses in conjunction with obtaining and using immigration visas and other documents required by the immigration laws. Forging or counterfeiting immigration visas or permits; using or attempting to use a forged, counterfeit, or altered document; unlawfully possessing any

[47] 39 Stat. 874, 878–879; 8 U. S. C. 138.
[48] See 3, act of October 16, 1918, 40 Stat. 1012; 8 U. S. C. 137.
[49] Sec. 125 of the act of March 4, 1909, 35 Stat. 1111; 62 Stat. 773, 18 U. S. C. 1621

blank permit; engraving or possession of plates for the printing of permits; in any manner making an impression or likeness of an immigration visa or permit; or having in one's possession distinctive paper adapted for the printing of immigration visas or permits are made offenses. The same section also makes it a crime for any individual, when applying for an immigration visa or permit or for admission to the United States, to personate another, to evade or attempt to evade the immigration laws by appearing under an assumed name, or to dispose or to offer to dispose of immigration visas or permits to anyone not authorized by law to receive such documents. A false statement under oath in any application, affidavit, or other document required by the immigration laws or regulations is likewise made an offense. Each of these offenses is punishable by a fine of not more than $10,000 or imprisonment for not more than 5 years, or both. While this section particularly refers to offenses in relation to documents required by the Immigration Act of 1924, it is not limited to such act. It is an offense to personate another when applying for admission to the United States and it has been held that the crime may be committed by improperly using a passport.[50]

### e. Special offenses

#### (1) Alien registration violations

The Alien Registration Act of 1940[51] contains penal provisions to aid in its proper enforcement. Any alien who is required to be registered and fingerprinted, or any guardian who is required to register any alien and who willfully fails or refuses to make application for registration, either on behalf of himself or his ward, is subject to a fine of not more that $1,000 or imprisonment for not more than 6 months, or both. Failure to give written notice of change of address required by the Alien Registration Act subjects the offender to a fine of not more than $100 or to imprisonment for a term of 30 days, or both. The making of a false statement in an application for registration known by the alien or legal guardian to be false, or the procurement or attempt to procure registration by fraud, is punishable by a fine of not more than $1,000 or imprisonment of not more than 6 months, or both. An alien convicted of these offenses within 5 years after entry into the United States is thereby subjected to deportation.

The act of October 13, 1941,[52] amended the Alien Registration Act by making it an offense to photograph, print, or in any manner make, or execute, any engraving, print, or impression in the likeness of an alien registration receipt card without proper authorization. The penalty upon conviction is a fine not to exceed $5,000 or imprisonment for not more than 5 years, or both.

#### (2) Assaulting immigration officers

Section 16 of the act of 1917 provides that anyone who assaults or interferes with an immigration official in the performance of his duty is guilty of a misdemeanor and is punishable by imprisonment for not more than 1 year or by a fine of not more than $2,000, or both. Where this offense is committed by the use of a deadly or dangerous weapon, the offender is guilty of a felony and is punishable by imprisonment of not more than 10 years.[53]

[50] *United States v. Mowgas*, 42 F. 2d 743 (1930).
[51] Sec. 35, act of June 28, 1940; 54 Stat. 670; 55 Stat. 736; 8 U. S. C. 457.
[52] 55 Stat. 736; 8 U. S. C. 457.
[53] Sec. 16, act of February 5, 1917; 39 Stat. 874, 885-887; 8 U. S. C. 152.

#### (3) Conspiracy

The conspiracy section of the Penal Code, section 37, can frequently be utilized effectively concerning conspiracies to violate various provisions of the immigration laws. This is particularly true in relation to conspiracies to violate section 8 of the act of 1917. Punishment is a fine of not more than $10,000 or imprisonment of not more than 5 years, or both.[54]

#### (4) Stowaways

While not strictly an immigration offense, the act of June 11, 1940,[55] makes it a misdemeanor for any person to stow away on a vessel or to assist another to do so. It applies to both citizens and aliens and covers those who stow away either in the United States or out of the United States if the vessel later enters the United States. Punishment is a fine of not more than $500 or imprisonment for not more than 1 year, or both.

The Act of March 4, 1944,[57] also not strictly an immigration law, provides in part that any person, citizen or alien, who stows away, either on certain privately owned aircraft or certain aircraft owned by the United States Government, shall be subject to a fine of not over $1,000 or imprisonment of not over 1 year, or both.

#### (5) Unauthorized landing of aliens

Section 10 of the Immigration Act of 1917, requires a transportation line to prevent the landing of aliens, except seamen, at a time or place other than as designated by immigration officials. The owner, master, officer, or agent who fails to do so is deemed guilty of a misdemeanor and is punishable by fine in each case of not less than $200 nor more than $1,000 or by imprisonment for a term not exceeding 1 year, or both. If, in the opinion of the Attorney General, it is impracticable or inconvenient to prosecute, such person is liable to a civil penalty of $1,000, which is a lien on the vessel. The requirement that the Attorney General must decide whether a criminal proceeding is to be instituted or a suit to recover the civil penalty filed, has given rise to a distinctive proceeding. When it has been ascertained by a field officer of the Service that perhaps there has been a violation of section 10, notice is served upon a person named in the section that it is proposed to recommend to the Attorney General that a prosecution be brought and 60 days is given to show why proceedings should not be instituted or why a criminal action should be brought rather than a civil proceeding.[58] The Attorney General has delegated to the Board of Immigration Appeals the power to act for him in this regard.[59] On the basis of the reply made to the notice and of a report made by the field office, a decision is reached by the Board of Immigration Appeals whether it appears that a violation of law occurred and if so, whether to prosecute criminally or civilly. Thereafter, the case is handled through the Office of the Assistant Attorney General in charge of criminal prosecutions. In the civil proceedings, the penalty is $1,000, no more, no less. In the criminal prosecution, the range of the penalty is from $200 to $1,000 with a possible prison sentence up to 1 year.

[54] Sec. 37, act of March 4, 1909; 35 Stat. 1088; 62 Stat. 701, 18 U. S. C. 172.
[55] Secs. 2, 3, act of June 11, 1940; 54 Stat. 306; 18 U. S. C. 2199
[57] 58 Stat. 711; 18 U. S. C. 2199
[58] 8 CFR 166.12.
[59] 8 CFR 90.3.

### f. Jurisdiction and venue

The district courts of the United States have original jurisdiction of all causes, civil and criminal, arising under the provisions of the immigration laws. In general, the prosecution of crimes in the Federal courts is governed by the Federal Rules of Criminal Procedure (18 U. S. C. A., following sec. 687), effective March 21, 1946. Section 25 of the 1917 act provides that prosecutions or suits for violations of the immigration laws may be instituted at any place in the United States at which the violation may occur or at which the person charged with the violation may be found. The section is rarely invoked and it is the general rule that violations must be prosecuted in the judicial district in which the offense was committed.[60] An exception to this may be found in section 4 of the 1917 act,[61] involving importation of aliens for an immoral purpose where the accused may be tried in any district in which a violation of any of the provisions of that section occurs.

#### 3. CIVIL PENALTIES IMPOSED JUDICIALLY

### a. Failure to file certificate of foreign posting of immigration laws

Section 8 of the act of March 3, 1893,[62] requires transportation companies regularly engaged in bringing alien immigrants to the United States twice yearly to file a certificate with the Attorney General that they have furnished each of their agents abroad a copy of all immigration laws printed in the language of the country where the agent is located, to be exposed to view and to be called to the attention of all prospective immigrants. A penalty not exceeding $500 is imposed for violation of this section.

### b. Signing on seamen to land illegally in the United States

Section 31 of the act of 1917 provides a penalty not exceeding $5,000 for knowingly signing an alien on the ship's articles with the purpose of landing him in the United States contrary to law or for falsely representing to an immigration officer that the alien is a bona fide member of the crew.

#### 4. ADMINISTRATIVE PENALTIES

### a. Classification

In addition to immigration penalties imposed in judicial proceedings either criminal or civil, there are those imposed through a proceeding which is entirely administrative. These penalties are against carriers or employees of carriers. The penalty in each case is a fine and it is for this reason that immigration administrative penalties are commonly referred to as fines. The statute vests in the Attorney General, rather than in the courts, the power to decide whether there has been a violation of law and whether a penalty has been incurred. Administrative penalties may be divided into three classes: (1) Fines for bringing aliens of certain prohibited classes to United States, (2) fines in the aid of orderly inspection of aliens, (3) fines for the protection of passengers traveling to the United States.

---

[60] Rule 18, Federal Rules of Criminal Procedure (18 U. S. C. A., following former sec. 687)

[61] 39 Stat. 874, 878-879; 8 U. S. C. 138.

[62] 27 Stat. 569-571; 8 U. S C. 172.

---

### b. Penalties for bringing aliens of the excluded classes

#### (1) Bringing aliens unlawfully solicited to come to the United States

It was previously pointed out,[63] that anyone engaged in the business of transporting aliens to or within the United States, who solicited or otherwise encouraged any alien to come to the United States, is subject to either a criminal or civil penalty and, with reference to this offense, whether or not the alien is actually brought to the United States is immaterial. Section 7 of the 1917 act also provides that the owner, master, officer, or agent of a vessel which has brought to a port of the United States an alien solicited by any such persons to immigrate to the United States is subject to a penalty of $400 for each violation. Whenever it appears to the satisfaction of the Attorney General that the provisions of section 7 are being persistently violated by any carrier, he may deny to that carrier the privilege of landing alien immigrant passengers at United States ports for such a period as, in his judgment, may be necessary to insure an observance of the statute. Originally, this statute was designed to stop widespread and objectionable solicitation by steamship companies, but it is rarely violated today.

#### (2) Bringing aliens who are diseased, illiterate, or natives of the barred zone

Section 9 of the 1917 act contains most of the penalties for bringing aliens to the United States who are inadmissible under the provisions of the act of 1917. A fine of $1,000 is imposed on any carrier for bringing to the United States from either a foreign country or an insular possession of the United States any alien afflicted with idiocy, imbecility, feeble-mindedness, insanity, epilepsy, constitutional psychopathic inferiority, chronic alcoholism, tuberculosis in any form, or a loathsome or dangerous disease.

A fine of $250 is also imposed upon carriers for bringing aliens to the United States with physical defects of a nature which may affect their ability to earn a living or aliens who have mental defects other than those above enumerated.

A fine of $1,000 is imposed on carriers for bringing to the United States any alien who is inadmissible because he is unable to read or is a native of that part of Asia and adjacent islands commonly referred to as the "barred zone" from which immigration is prohibited.

In addition to the basic sum paid as a penalty, there is added a sum equal to that paid by the alien for his transportation from the port of departure to the port of arrival in the United States which sum is given to the excluded alien as compensation for a fruitless journey to the United States. Railway lines entering the United States from contiguous territory are exempted from these provisions.

For bringing diseased aliens, the statute provides that the penalty has been incurred if the alien was afflicted with the disease or disability at the time of foreign embarkation and that the existence of the disease or disability might have been detected by means of competent medical examination. In the case of illiterates or natives of the barred zone, the statute prescribes that the fine has been incurred

---

[63] See p. 645.

if it appears to the satisfaction of the Attorney General that the disability might have been detected by the exercise of reasonable precautions prior to the departure of the alien from a foreign port.

*(3) Bringing aliens previously arrested and deported*

A fine of $300 is imposed on any master, charterer, person in charge, agent, owner, or consignee who knowingly brings to the United States any alien who has been excluded from the United States or arrested and deported from the United States under any provision of law until such time as the alien may be lawfully entitled to reapply for admission to the United States.[64] The Government must prove that the carrier or other responsible person knowingly brought the inadmissible alien.

*(4) Bringing aliens without proper immigration visas*

Section 16 of the Immigration Act of 1924 deals with penalties for bringing aliens to the United States not in possession of documents required by that act. A fine of $1,000 is imposed for bringing any immigrant, except from foreign contiguous territory, who does not have an unexpired immigration visa or a quota immigrant who is specified as a nonquota immigrant in his immigration visa. In addition to the fine of $1,000, there is also imposed on the carrier a sum equal to that paid for the transportation of the alien to the United States, which is returned to the inadmissible alien. The statute provides that the penalties shall not be remitted or refunded unless it appears to the satisfaction of the Attorney General that the carrier or other responsible persons mentioned in the section prior to the departure of the vessel from the last port outside of the United States, did not know, and could not have ascertained by the exercise of reasonable diligence that the individual transported was an immigrant, if the fine is for bringing an immigrant without an immigration visa; or that the immigrant transported was a quota immigrant, if the fine is for bringing a quota immigrant who has a nonquota immigration visa.

*c. Orderly inspection, detention, and deportation*

*(1) Failure to file manifests*

Sections 12 and 13 of the Immigration Act of 1917 require manifests for alien passengers arriving in or departing from ports of the United States by vessel. Section 14 of the act of 1917 imposes a fine of $10 upon the master or commanding officer of any vessel bringing any aliens into or out of the United States who fails to deliver the manifests required by sections 12 and 13.

*(2) Failure to manifest seamen*

Section 36 of the act of 1917 describes the manifest required in the case of arriving alien seamen and requires notice to the immigration authorities of all changes in crew between the arrival and departure of the ship. Like section 14, it imposes a penalty in the sum of $10 for each alien concerning whom correct reports or manifests are not furnished as required by the statute.

*d. Detention and deportation of excluded aliens*

*(1) Detention and deportation of excluded passengers*

Section 18 of the act of 1917 requires that all excluded aliens shall be immediately deported on the vessels bringing them to the United

[64] Sec. 18, act of February 5, 1917; 39 Stat. 874, 887, 889; 45 Stat. 1551; 8 U. S. C. 154.

States or another vessel of the same line. It provides that the cost of maintenance while on land, as well as the expense of the return of such alien, shall be borne by the owner of the vessel on which the aliens arrived. Failure to deport or to pay detention expenses subjects the master, purser, person in charge, owner, or consignee of the vessel to a fine of $300 in relation to each excluded alien. The statute also provides a penalty of $300 where the transportation company accepts any guarantee to cover detention expenses and possible deportation charges in the event of exclusion.

*(2) Failure to deport*

Under section 20 of the 1917 act, transportation companies which have brought aliens to the United States who have been regularly admitted are liable under certain conditions for the cost of deportation where proceedings are instituted within 5 years of the alien's arrival. A failure or refusal on the part of the master, agent, owner, or consignee of the vessel, to deport in accordance with this mandate of law, subjects him to a penalty of $300 for each violation.

*(3) Detention and deportation of seamen*

It was previously stated that section 10 of the act of 1917 imposes a civil or criminal penalty for permitting alien passengers to land without undergoing the required inspection. Section 20 of the 1924 act has a similar provision in regard to alien seamen. It is, however, broader in its scope. Unlike section 10, the penalty imposed under section 20 is administratively imposed. Section 20 provides that the owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof, who fails to detain on board an alien seaman until inspected or who fails to detain such seaman on board after inspection and to deport if required to do so by the immigration officer in charge at the port of arrival, shall pay a penalty in the sum of $1,000 for each alien seaman in respect of whom such failure occurs. Proof that an alien seaman did not appear on the outgoing manifest of the vessel on which he arrived or that he was listed by the master as a deserter is a prima facie evidence of failure to detain or deport.

*e. Penalties for the protection of passengers*

In the last category of administrative fines is one for the protection of passengers on board vessels. Section 35 of the act of 1917 makes it unlawful for a vessel carrying passengers between a port of the United States and a foreign port to have employed on board an alien afflicted with idiocy, imbecility, insanity, epilepsy, tuberculosis in any form, or a loathsome or dangerous contagious disease, provided it appears to the satisfaction of the Attorney General from an examination made by a medical officer of the United States Public Health Service that the alien seaman was so afflicted at the time he was so shipped or engaged and taken on board the vessel, and that the existence of such affliction might have been detected by means of a competent medical examination performed at that time. The penalty for violating this section is $50 in regard to each afflicted seaman but the Attorney General has discretion to mitigate or remit the fine

### f. Procedure

Where an officer in charge of an immigration station believes that a violation of one of the fine provisions has occurred, it is his duty promptly to serve upon the master, agent, owner, or other responsible person a notice that the facts ascertained indicate a violation of law has occurred. This notice must set forth succinctly the nature of the violation with a citation of the statute alleged to have been violated. Pending the determination of liability to fine, the vessel is refused clearance unless a suitable deposit or bond covering the entire fine is given to the collector of customs of the district where the violation occurred. When the reply to the notice of intention to fine is filed with the district office (which is called the protest of the line) the entire record, including a report of the officer in charge concerning the facts of the alleged violation of law, is forwarded to the central office, and on this record, the Board of Immigration Appeals renders a decision whether a fine has been incurred and penalties should be imposed.

The procedure which is to be followed where a penalty is based upon the bringing to the United States of a diseased or afflicted alien has been previously discussed.[65] The medical evidence offered by the line in its protest, together with the medical reports of the Public Health Service, make up part of the record which is submitted to the Board of Immigration Appeals. The carrier may be represented by counsel or others in arguing the merits of its case before the Board of Immigration Appeals. If it is found that a violation of law has occurred, the collector of customs is notified through regular channels; he collects the fine from the carrier. If a cash deposit has been made, it is turned into the Treasury of the United States. If bond has been filed, suit may be had thereon upon failure of the carrier to promptly pay the penalty imposed.

If no fine is assessed, the collector of customs returns the deposit, if one made, or exonerates the bond as to the proceeding in question.[66]

### 5. COMMENTARY

#### a. Suggestions relating to criminal provisions

The testimony of witnesses and the comment received from field offices of the Immigration and Naturalization Service stressed certain sections of the present law, particularly those relating to illegal entry and smuggling of aliens. Most of the statements were devoted, not so much to the law itself, but to difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area. It was stated that many flagrant violators of the immigration laws are not prosecuted or, if prosecuted, get off with suspended sentences or probation. Apparently, the reason for this is the fact that the aliens in most cases will be deported regardless of conviction and sentence, and the crowded conditions prevalent in most prisons and penitentiaries. On the other hand, in other sections of the country, particularly on the east coast, a number of alien smugglers were successfully prosecuted during 1949 and received appropriate sentences.

To enact legislation providing for a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the

problem in the opinion of the subcommittee. If prosecutions and convictions are difficult to obtain under the present statutes, to increase the penalties thereunder would make them even more difficult to obtain. Since the situation appears to be a local problem and a question of administration of present statutes rather than a legislative matter, it is believed that it should be left to the proper authorities to work out some solution.

It was pointed out that section 8 forbids the concealing or harboring of aliens unlawfully entering the United States but fails to provide a penalty therefor. Numerous suggestions have been received that the deficiency in the present statute be supplied by appropriate legislation, including a provision that any vehicles or conveyances used in transporting aliens unlawfully be made subject to seizure.

The necessity of correlating the criminal provisions of the law received much comment. A good example of such correlation may be found in the act of March 4, 1929, and section 4 of the 1917 act. Both acts penalize a reentry after deportation but section 4 relates only to the reentry of persons deported as prostitutes or other immoral persons. It was suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor, and that the present act of March 4, 1929, should be reenacted to cover any and all deportations.

A number of the criminal provisions are rarely violated today and have become more or less obsolete, especially since the passage of the 1924 act. It was suggested that such provisions as have no present value be repealed, including the clauses on inducement or solicitation of immigration, importing contract laborers, and foreign advertisements for laborers.

The subcommittee is aware of the fact that different sections of the country are not all faced with the same problems. Seaports of entry have difficulties not experienced at our land border points of entry. The subcommittee must concern itself with laws which apply equally to all sections of the country and accordingly such recommendations as will be made must provide generally applicable practice.

#### b. Suggestions relating to administrative penalties

Much of the comment received relative to the criminal provisions of the law applies likewise to the administrative penalties or fines. It was pointed out that with the passage of the act of 1924, providing for examination of aliens abroad and the requirement for visas, many of the present administrative fines are no longer necessary. These would include the requirement that transportation companies post copies of our immigration laws in all their foreign offices and the soliciting of aliens by transportation companies to come to the United States as passengers. It was also suggested that consideration be given to a revision of the statutes imposing penalties on transportation companies for bringing to the United States aliens who are found to be excludable upon arrival. It was stated that these statutes were enacted mainly because of the practice of bringing aliens to the United States in great numbers, regardless of the possibility of exclusion after arrival. Again the act of 1924 requiring examination abroad and possession of a visa prevents any wholesale abuses.

65 See p. 651.
66 8 CFR 160.1-160.19

## 6. RECOMMENDATIONS

In the consideration of any revision or amendments to the criminal provisions of the immigration law, it must be borne in mind that the new title 18 of the United States Code was enacted June 25, 1948 (Public Law 772, 80th Cong., 62 Stat. 683). This law repeals numerous statutes and parts of statutes relating to crimes and criminal procedure. The enactment of title 18 was intended to make the law more accessible through the modern alphabetical arrangement of classification, the employment of uniform language and style, and the reconciliation of conflicting laws. Only one or two statutes relating to immigration crimes were reenacted in the present title 18. All of the crimes relating to nationality were substantially reenacted in title 18.

It is recommended that, with a few exceptions all of the penalties both judicial and administrative, be substantially reenacted. The bringing in and harboring of aliens should be amended to provide a penalty for the illegal harboring which is lacking in the present statute.

The proviso in section 23 of the 1917 act relating to the improper landing of aliens from Canada or Mexico and the requirement that suitable landing stations be provided should be carried forward without the present criminal penalty. Such penalty is covered in the section relating to entry of an alien at an improper time or place.

The provisions relating to the importation of contract laborers, foreign advertisements for laborers, and inducement or solicitation of immigration should be repealed. The problem is met by the visa system and the selectivity provisions of the proposed law.

The illegal entry section should be carried forward with an increased penalty for subsequent offenses.

The provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty.

The present perjury section should be repealed, inasmuch as aliens making false statements under oath may be prosecuted under the general perjury statute in title 18 of the Criminal Code.

The false personation provision has been reenacted in title 18 and this section should be carried forward with a few minor changes.

The prevention of unauthorized landing of aliens should be amended to provide for an administrative fine only. A criminal violation is provided for in the section relating to the unlawful bringing or harboring of aliens.

The requirement for the posting of immigration laws abroad and the penalty imposed for failure to do so has become obsolete and should be repealed.

## CHAPTER VIII

## TERRITORIES AND POSSESSIONS

### A. TERRITORIAL STATUS

Alaska and Hawaii are organized Territories of the United States. Under the Immigration Act of 1917, Hawaii is treated as an insular possession. Alaska is treated as an integral part of the continental United States. The insular possessions are Puerto Rico, the Virgin Islands of the United States, Guam, and American Samoa. The Isthmian Canal Zone is under a lease in perpetuity to the United States, but for immigration purposes, it is considered as foreign territory.[1]

### B. DEFINITIONS

Since certain definitions are not identical in their applicability under the Nationality Act and under the provisions of immigration law which determine the immigration status of residents and native-born citizens of the Territories and possessions, it is important to review applicable definitions.

#### 1. ALIEN

The term "alien" includes any individual who is not a native born or naturalized citizen of the United States. It does not include individuals who are citizens of the islands which are under the jurisdiction of the United States. This is in accordance with the provisions of section 28 of the act of 1924.

#### 2. NATIONAL

A national is any individual who owes permanent allegiance to the United States. It refers to both citizens and noncitizens of the United States. Normally the term is used when referring to inhabitants of our insular possessions who owe allegiance to the United States but who are not citizens of the United States.

#### 3. ENTRY INTO THE UNITED STATES

An entry into the United States, within the meaning of the immigration laws, is an arrival from some foreign port or place or from an insular possession. An alien who leaves the Canal Zone or any insular possession of the United States may enter another possession of the United States only under the conditions applicable to all aliens. The United States is defined as being the several States, the District of Columbia, the Territories of Alaska and Hawaii, Puerto Rico, our Virgin Islands, and any waters, territory, or other place subject to the

---

[1] Immigration Manual, secs. 1511, 1512; sec. 1 of the act of 1917, 39 Stat. 874; secs. 25 and 28 of the act of 1924, 43 Stat. 153.

## APPENDIX I

### RESOLUTIONS AUTHORIZING THE SENATE COMMITTEE ON THE JUDICIARY TO INVESTIGATE THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES

SENATE RESOLUTION 137, EIGHTIETH CONGRESS, FIRST SESSION

*Resolved,* That the Senate Committee on the Judiciary, or any duly authorized subcommittee thereof, is authorized to make a full and complete investigation of our entire immigration system, including, but not limited to, (1) the history and development of our immigration policy; (2) the administration of our immigration and deportation laws, and practices thereunder; (3) the extent, if any, to which aliens have entered the United States in violation or circumvention of such laws, and the extent, if any, to which aliens have been permitted to remain or have remained in the United States in violation or circumvention of such laws; (4) the situation with respect to displaced persons in Europe and all aspects of the displaced-persons problem; and (5) the effect upon this country of any change in the immigration laws.

SEC. 2. The committee shall make a report of its findings to the Senate at the earliest practicable date, but in no event later than March 1, 1948, together with such recommendations for changes in the immigration and naturalization laws as it may deem advisable: *Provided, however,* That the committee shall report its findings and recommendations in a separate report with respect to displaced persons in Europe on or before January 10, 1948.

SEC. 3. For the purposes of this resolution, the committee or any duly authorized subcommittee thereof, is authorized during the sessions, recesses, and adjourned periods of the Eightieth Congress, to employ upon a temporary basis such technical, clerical, and other assistants as it deems advisable. The expenses of the committee under this resolution, which shall not exceed $50,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman of the committee.

———

SENATE RESOLUTION 178, EIGHTIETH CONGRESS, FIRST SESSION

*Resolved,* That S. Res. 137 of the Eightieth Congress, first session, is amended by striking out the word and figures "January 10, 1948", on page 2, section 2, line 12, and inserting in lieu thereof the following word and figures: "February 10, 1948".

804    UNITED STATES IMMIGRATION AND NATURALIZATION

SENATE RESOLUTION 236, EIGHTIETH CONGRESS, SECOND SESSION

*Resolved,* That the authority of the Committee on the Judiciary, or any duly authorized subcommittee thereof, under S. Res. 137, of the Eightieth Congress, agreed to July 26, 1947 (providing for a full and complete investigation of our entire immigration system), is hereby continued until March 1, 1949, and the limit of expenditures under such resolution is hereby increased by $50,000.

SENATE RESOLUTION 40, EIGHTY-FIRST CONGRESS, FIRST SESSION

*Resolved,* That the authority of the Committee on the Judiciary, or any duly authorized subcommittee thereof, under S. Res. 137, of the Eightieth Congress, agreed to July 26, 1947 (providing for a full and complete investigation of our entire immigration system), is hereby continued until March 1, 1950, and the limit of expenditures under such resolution is hereby increased by $135,000.

## APPENDIX II

### SYNOPSIS OF THE PRINCIPAL RECOMMENDATIONS FOR CHANGES IN THE IMMIGRATION AND NATURALIZATION LAWS

The extensive study of our immigration and naturalization laws has resulted in the numerous recommendations made in the foregoing report and incorporated in the bill which accompanies the report. One of the major and important determinations made by the subcommittee was that our immigration and naturalization laws should be treated as a unit, and made the subject of one omnibus bill, consisting of four titles, as follows:

Title I—General
Title II—Immigration
Title III—Naturalization
Title IV—Miscellaneous

This synopsis does not propose to be an exhaustive or comprehensive survey of all of the changes proposed in the bill, but does propose to set out briefly the principal and most important and significant changes contained in the bill.

#### TITLE I—GENERAL

This title contains the definitions used in all other titles of the bill; provides general authorization to the Commissioner to administer and enforce the proposed act as it relates to the Service; sets up a Bureau of Passports and Visas in the Department of State, to replace the Visa Division and the Passport Division, as now constituted in that Department; authorizes liaison between the Commissioner, the Director of the Bureau of Passports and Visas, the Federal Bureau of Investigation, and the Central Intelligence Agency; and more closely defines the scope of judicial review on administrative actions and decision, than is done under existing law.

#### TITLE II—IMMIGRATION

This title, embodying the proposed law relating to immigration of aliens to the United States, their status while in the United States, and the methods and procedures to be followed in effecting their departure, either voluntarily or by deportation, combines the basic principles of the 1917 and 1924 Immigration Acts with the amendments and revisions considered necessary and desirable to a complete revision and codification of our immigration laws.

*1. Classes of aliens prohibited from entering the United States*

The excludable classes have been enlarged by addition of the following classes of aliens who would be denied admission: Homosexuals and sex perverts; persons convicted of two or more crimes, whether or not

involving moral turpitude, if the aggregate possible confinement exceeded 1 year; aliens seeking to enter solely, principally or incidentally to engage in any illicit sexual act or any other immoral act; aliens seeking to enter the United States to perform services or labor unless authorized by the Commissioner to enter for such purpose; aliens who seek to procure or who have procured a visa or other documentation, or who seek to enter, by fraud, false claim or by willful misrepresentation of a material fact; aliens not possessed of a valid immigrant visa or other valid entry document; nonimmigrants not in possession of a passport and nonimmigrant visa; aliens convicted of narcotic law violations; and subversive aliens in a class more widely proscribed and defined.

### 2. Classes of persons who may enter the United States

The exemptions to restrictions on entry, embodied in the "provisos" of section 3 of the 1917 act, are retained, modified, changed, or repealed, as follows:

(a) The only class of persons exempt from the literacy requirements would be those persons lawfully admitted as permanent residents who are returning from a temporary visit abroad.

(b) Persons whose only ground for exclusion is conviction of a purely political offense would be continued in an excepted status.

(c) The classes of persons (1) whose passage is paid for by a corporation or organization, or (2) who are skilled laborers, or (3) who are artists, or (4) who are conducting fairs or special exhibitions would be removed from excepted classes and their entry would be permitted under general provisions of the law.

(d) Persons returning from a temporary visit abroad to an unrelinquished United States domicile of seven consecutive years, in order to be admitted would have to prove that the said domicile consisted of actual physical presence in the United States and was not merely presumptive residence.

(e) The two classes of persons presently excepted from exclusion, namely foreign-government and international-organization officials, and those admitted in the discretion of the Commissioner, would be continued as exempt from exclusion.

The President is given the power to suspend or restrict entry of any alien or class of aliens whose admission he finds to be detrimental to the interests of the United States.

### 3. Nonimmigrant classes

The nonimmigrant classes are more closely and exactly defined. Students would be placed in this category, rather than in the nonquota class, since they are admitted for temporary periods only. A new nonimmigrant class is created to include persons entering temporarily to perform services of exceptional merit and ability or services requiring lesser ability of a seasonal nature, where unemployed labor capable of performing such services cannot be found in the United States.

### 4. The quota system

The quota system of the 1924 act is simplified and continued, but racial restrictions to immigration are removed and a quota system for the Asiatic-Pacific area, known as the "Asia-Pacific Triangle" would govern immigration from that area where present immigration

law prohibits immigration. Each quota area would have a minimum quota of 100, with reallocation of minimum quotas after 50 minimum-quota areas throughout the world have been established.

Quota visas under the quota system would be issued on a selective basis, with allotments as follows: 30 percent to immigrants urgently needed in the United States because of education, technical training, specialized experience, or exceptional ability; 50 percent to qualified immigrants who are the parents of United States citizens 21 years of age or over; 20 percent to qualified immigrants who are the spouses or children of resident aliens legally admitted for permanent residence. Individual quotas not used, up to 10 percent of each annual quota, would be available to other qualified quota immigrants, with first preference of not more than one-half of such 10 percent going to brothers and sisters of United States citizens.

Visas issued would be revocable by consular officers or the Director at any time, and the duration of nonimmigrant visas would be on a basis of reciprocity with foreign countries. The power of the consul to refuse to issue visas is extended to cover all grounds for which an alien could be excluded at a port of entry. Physical and mental examinations of arriving aliens and immigration inspection would be conducted by one medical officer and by one immigration officer, respectively, rather than by two, as at present.

### 5. Detention and deportation of aliens

Detention expenses would not be assessed against the vessel or aircraft if the alien brought by such vessel or aircraft was in possession of an unexpired visa issued by a consular officer within 60 days of the alien's foreign embarkation.

In exclusion proceedings, boards of special inquiry are replaced by a special inquiry officer, from whose adverse decision the alien could appeal to the Commissioner. In expulsion proceedings, before a warrant of deportation can issue, a finding of deportability must be made after a proceeding before a special inquiry officer.

Crewmen on vessels and aircraft would be detained until permission to land is granted. If permitted to land, the landing permission may be revoked and the crewmen returned to the vessel or aircraft. It would be unlawful for a master or commanding officer of a vessel or aircraft to pay off or discharge any crewman without first obtaining permission to do so from the proper immigration officers.

A penalty for harboring an alien is provided, in addition to the present penalty for bringing in aliens not duly admitted by immigration officers.

The Alien Registration Act of 1940 is brought forward, with the additional requirement that the alien report to the Commissioner his place of residence on January 1, 1951, and within 10 days after each January 1 thereafter.

The present classification of deportable alien has been enlarged to include (1) an alien convicted of crime and who the Commissioner concludes is an undesirable resident of the United States; and (2) an alien who has been convicted of violation of any law pertaining to narcotics.

If an alien could not be deported within 6 months after issuance of an order of deportation, the Commissioner could place the alien under supervision, or, in the case of an alien deportable on criminal or sub-

versive grounds, could place such alien in detention, pending eventual deportation. The Commissioner is given more latitude in directing the country to which such alien might be deported.

The Commissioner is given authority to suspend deportation of any alien who has resided in the United States for a specified period of time, who can show good moral character for such period and whose deportation would result in extreme and unusual hardship. The suspension, however, is subject to review by Congress, and could not be effected without congressional approval of the suspension. Under certain conditions an alien admitted as a nonimmigrant could have his status adjusted to that of an alien lawfully admitted for permanent residence. In both suspension and adjustment cases, however, quota charges would have to be made either against current or future quotas. Any adjustment of status could be rescinded at the Commissioner's discretion if he later found the alien was not eligible for such adjustment.

### 6. Fees and miscellaneous provisions

Fees are raised to compensate for the increased costs of the services rendered in issuing immigrant visas, reentry permits, applications for adjustment of status, and extensions of stay. Nonimmigrant visa fees would be prescribed by the Director on a reciprocal basis, corresponding to similar fees charged our nationals by foreign countries.

The Commissioner is authorized to obtain information regarding any alien in the United States from any Government department or agency when such information is required for the enforcement of the immigration laws. An alien would be entitled to counsel in all proceedings before a special inquiry officer and on any appeal therefrom.

One basic principle incorporated in the bill is that which eliminates inequalities between the sexes in all rights and privileges extended to aliens or to citizens from whom such aliens may claim special consideration based on family relationship.

### TITLE III—NATIONALITY AND NATURALIZATION

This title, relating to qualifications for and acquisition of citizenship, and loss of and regaining of United States nationality, follows the general pattern set out in the Nationality Act of 1940, as amended, and the changes proposed in this title are for the purpose of strengthening the operation of our naturalization laws and of conforming them to the immigration law proposed in title II.

### 1. Qualifications for citizenship

Probably the most far-reaching proposal under the general provisions for eligibility for citizenship is that which would eliminate racial bars to naturalization. The bill removes the last racial barrier, both to immigration and naturalization.

The present provision that a person must be able to speak English before becoming a naturalized citizen is changed by the bill, to require that such a person be able also to read and write English, and that he be grounded in the principles and form of our Government.

The present requirement that a person reside 5 years in the United States before naturalization is subject to many exceptions. The bill eliminates all but a very few of these exceptions, and thus makes most

aliens subject to the 5-year residence requirement, and in most cases requires that the residence be actual physical presence.

With regard to good moral character, attachment to the principles of the Constitution, and similar requirements of existing law, all of which are continued in the bill, the additional requirement is made that the alien have a knowledge and understanding of the fundamentals of the history, and of the principles and form of government of the United States. The bill also redefines the proscribed subversive classes of persons who may not be naturalized.

### 2. Procedures relating to naturalization

The declaration of intention and the provisions that a petition for naturalization be supported by the testimony of two witnesses are both omitted from the bill. In their stead provision is made for a so-called "neighborhood investigation" of each and every petitioner for naturalization. This investigation will cover the conduct, character, and activities of the petitioner in the place or places of his residence and work for at least 5 years preceding his naturalization. Provision is also made which would allow the court and the Service to go beyond the present 5-year limit in ascertaining good moral character and similar prerequisites to naturalization.

This title also requires a petitioner for naturalization to take an oath to bear arms in defense of the United States when called upon by law to do so. Exception is made for persons who by reason of religious training and belief cannot in good conscience take this oath, and such persons will be allowed to take an oath to serve in a noncombatant capacity in the armed forces.

### 3. Loss of or revocation of citizenship

Numerous changes are proposed in the manner and the extent to which citizenship may be lost. One of the basic provisions of the bill is that which requires a person having dual nationality, either to divest himself of his foreign nationality or forfeit his American citizenship. The classes of persons who may live abroad after naturalization without thereby losing their American citizenship have been redefined with the purpose in mind of doing everything possible to prevent such dual citizenship, and to allow foreign residence in certain equitable cases.

Another proposal involving a basic change is that relating to revocation of nationality by judicial process. The ground on which such revocation is based is changed from fraud or illegality in procurement, to concealment of a material fact or willful misrepresentation in procurement of naturalization. Special provision is made for revocation of naturalization of a person who within 5 years thereof places himself in the class of persons proscribed as subversive.

### 4. Regaining American citizenship

A limited time is provided in certain cases allowing persons who have heretofore expatriated themselves either through their own act or through the loss of citizenship by their parents, to reenter the United States for the purpose of regaining their lost citizenship. The persons who may so regain citizenship are women who lost citizenship by marriage to an alien, children who have lost citizenship through the expatriation of their parents, persons who have

served in allied armed forces, and deserters from the armed forces of the United States who have subsequently been permitted to reenlist. In all of these cases the general provisions of the existing law have been carried forward with, however, certain restrictive provisions which are designed to make the new law definite and unambiguous.

*5. Miscellaneous*

One significant and far-reaching proposal is that which would restrict the right of a person who is denied American nationality by an agency or department of the Government from bringing a declaratory judgment to have his citizenship status determined. Under present law such a person may bring such an action whether he is within the United States or abroad. The bill restricts this privilege to those who are within the United States.

The bill raises the fees charged by the Commissioner and by the court in naturalization proceedings to bring them in line with present-day costs.

## TITLE IV—MISCELLANEOUS

This title provides for amending other provisions of existing law affected by the proposed bill; repeals existing immigration and naturalization laws and acts amendatory thereto; authorizes appropriation of funds to implement the proposed act; and contains the usual separability clause.

## APPENDIX III

## STATISTICS ON INTERNATIONAL MIGRATIONS

TABLE 1.—*Estimated world Jewish population*

| Area | 1939 | 1947 |
|---|---|---|
| United States and Canada | [1] 4, 965, 620 | 5, 170, 500 |
| South and Central America | 524, 000 | 578, 000 |
| Europe | 9, 739, 200 | 3, 920, 100 |
| Asia | 771, 500 | 917, 000 |
| Australia | 33, 000 | 35, 000 |
| Africa | 609, 800 | 639, 500 |
| Total | 16, 643, 120 | 11, 208, 6'0 |

[1] The Jewish population of Canada was 165,620 in 1939 and 176,500 in 1945, according to the estimates of the Canadian Jewish Congress.

Source: American-Jewish Year Book—1947–48, p. 737

TABLE 2.—*Number of Chinese residing abroad, 1922*

| | | | |
|---|---|---|---|
| Annam | 197, 300 | Korea | 11, 300 |
| Australia | 35, 000 | Macao | 74, 560 |
| Brazil | 20, 000 | Mexico | 3, 000 |
| Burma | 134, 600 | Peru | 45, 000 |
| Canada | 12, 000 | Philippines | 55, 212 |
| Cuba | 90, 000 | Siam | 1, 500, 000 |
| East Indies | 1, 023, 500 | Siberia | 37, 000 |
| Europe | 1, 760 | Straits Settlements | 432, 764 |
| Formosa | 2, 258, 650 | South Africa | 5, 000 |
| Hawaii | 23, 507 | Continental United States | 61, 639 |
| Hongkong | 314, 390 | | |
| Japan | 17, 700 | Total | 8, 179, 582 |
| Java | 1, 825, 700 | | |

Source: Maurice R. Davie, World Immigration (1936), p. 308.

TABLE 3.—*Emigration from Japan by destination, 1885 to 1924*

| Destination | Number | | | Percent | | |
|---|---|---|---|---|---|---|
| | 1885 to 1907 | 1908 to 1924 | 1885 to 1924 | 1885 to 1907 | 1908 to 1924 | 1885 to 1924 |
| Asiatic Russia | 59, 273 | 243, 673 | 302, 946 | 10. 9 | 37. 9 | 25. 6 |
| Hawaii | 178, 227 | 50, 531 | 228, 758 | 33. 1 | 9. 3 | 20. 2 |
| United States | 72, 545 | 123, 998 | 196, 543 | 13. 5 | 19. 2 | 16. 6 |
| China | 58, 388 | 46, 870 | 105, 258 | 10. 8 | 7. 3 | 8. 9 |
| Canada | 10, 513 | 19, 278 | 29, 791 | 2. 0 | 3. 0 | 2. 5 |
| Brazil | 34 | 25, 913 | 25, 947 | 0 | 4. 0 | 2. 2 |
| Philippines | 3, 175 | 19, 148 | 21, 323 | . 4 | 3. 0 | 1. 8 |
| Peru | 1, 108 | 19, 876 | 20, 984 | . 2 | 3. 1 | 1. 8 |
| Korea | 72, 027 | | (72, 027) | 13. 3 | | (6. 1) |
| Australia | 7, 540 | | (7, 540) | 1. 5 | | ( .6) |
| Other countries | 77, 161 | 84, 667 | 161, 828 | 14. 2 | 13. 2 | 13. 7 |
| Total | 539, 691 | 643, 254 | 1, 182, 945 | 100. 0 | 100. 0 | 100. 0 |

Source: Maurice R. Davie, World Immigration (1936), p. 319.