# Exhibit E

1952 CONGRESSIONAL RECORD — SENATE 2141

of this bill. It is indeed a collaborative product. I want to pay particular tribute to the efforts of the distinguished junior Senator from New York, whose personal dedication and energies helped carry this bill through all of its developmental stages. I request therefore that this bill be called the Humphrey-Lehman bill.

The VICE PRESIDENT. Under the rule of the Senate regarding the nomenclature to be used in connection with a bill, it is not provided that it shall be called anyone's bill; the bill is designated by number, not by name.

Mr. HUMPHREY. That is correct. Mr. President, my only reference to it was because of the identity it has with particular groups. I understand the rule of the Senate. It is merely a matter of record.

I ask unanimous consent that there be printed in the RECORD at this point a joint statement on the bill issued by my colleagues and me and the summary of the provisions of our new omnibus Immigration and Nationality Act of 1952.

The VICE PRESIDENT. The bill will be received and appropriately referred; and, without objection, the joint statement and summary will be printed in the RECORD.

The bill (S. 2842) to revise the laws relating to immigration, naturalization, and nationality; and for other purposes, introduced by Mr. HUMPHREY (for himself and other Senators), was read twice by its title, and referred to the Committee on the Judiciary.

The joint statement and summary are as follows:

JOINT STATEMENT BY SPONSORS OF NEW OMNIBUS IMMIGRATION AND NATURALIZATION BILL—SENATORS HUMPHREY, LEHMAN, BENTON, LANGER, KILGORE, DOUGLAS, MCMAHON, GREEN, PASTORE, MURRAY, KEFAUVER, MORSE, AND MOODY

We are today introducing an omnibus immigration and naturalization bill which codifies, simplifies, and humanizes our immigration and naturalization laws.

This bill strengthens our legal defenses against the admission of subversive and undesirable aliens, and facilitates the deportation of those already in this country.

At the same time, this bill permits the processing and admission, within the framework of our present quota system, of increased numbers of deserving and desirable aliens who can bring to America the invigorating stream of fresh talent, fervor, and energy which has, in the past, contributed so much to America's greatness.

This bill would enable us to meet the emergency world situation by providing a haven for religious and political persecutees from eastern, southern, central, and northern European countries behind the iron curtain. It would open our doors to limited numbers of otherwise qualified aliens from the teeming and overcrowded cities and villages of Italy, Greece, Holland, Germany and Austria—areas where surplus populations, indigenous and refugee, now strain the political stability and internal economy of the countries involved.

This bill would recruit aliens of special skills and capabilities, in agriculture, in industry, in the professions and the arts. The abilities and energies of these people would represent a vital contribution to our national economy and welfare.

This bill would reunite divided families, some members of which are already in the United States as citizens of permanently resident aliens.

Under the terms of this bill, all the above would be done within the quota framework. We would admit aliens in numbers which we could easily absorb and actually require for our expanding economy. All this would be done in accordance with a carefully designed system of checking and screening to insure the selection of deserving and desirable aliens and the rejection of subversive and undesirable aliens.

At the same time this bill would eliminate from present law the damning and damaging stigma of racial discrimination, and discriminations based on sex.

Another purpose of this bill is to couple justice with humanitarianism as the twin symbols of America in immigration as well as in other fields. We urgently need more equitable and more uniform procedures in the administration of our immigration laws. Peoples abroad know America best, and at closest hand, from their experience, or that of their neighbors, with our immigration officials. Unchecked bureaucracy is too much a feature of our present immigration laws. Under the terms of our bill, a board of visa review is set up, within the State Department, to provide greater uniformity in the granting and refusal of visas, and to provide a practical review and appeals procedure.

Under another section of our bill, the present Board of Immigration Appeals, now set up by Executive order, is given permanent and statutory authority to carry on the fine work it has been doing. Under the terms of our bill, the Administrative Procedures Act, providing court review of administrative decisions, is made applicable to deportation processes.

These are the main purposes and designs of our proposed omnibus immigration and naturalization bill.

We are aware that another omnibus immigration and naturalization bill, which evolved from measures sponsored by Senator McCARRAN, has been reported by the Judiciary Committee as S. 2550, and is now pending on the Senate Calendar.

We feel that our bill, rather than S. 2550, is the answer to our present needs in the immigration field. S. 2550 codifies existing immigration and naturalization laws and purports to correct some existing inequities, such as racial and sex discrimination. But, in actual effect, S. 2550 perpetuates and extends most present inequities, including the principle of discrimination, and in scores of different ways, some of them subtle and technical, operates to restrict, hobble, and hamstring immigration.

However worthy of its declaration of purposes, S. 2550 does not tighten up on immigration; it strangles immigration. Moreover, it grants new, arbitrary, and unchecked authority to consuls and immigration officials for exclusion and deportation, while emasculating the authority of the Attorney General to admit individuals and to suspend deportation.

S. 2550 adopts the arbitrary procedures of the police state in handling aliens who have just escaped tyranny and are seeking entry to the home of freedom. Many of the deportation procedures of S. 2550 are of a like nature.

S. 2550 contains no liberalizing provisions to meet the needs of the present world situation by admitting refugees and escapees from tyranny, or by providing haven for some of the surplus peoples in southern, central, and northern Europe. S. 2550 virtually shuts off the immigration of freedom-seeking individuals without ties or connections in this country—the so-called new-seed immigration from which many of our greatest Americans have come or sprung.

Our bill is the product of consultation with and deliberation among more than 30 voluntary agencies and religious groups and organizations directly concerned with immigration and the administration of our immigration and naturalization laws.

Representatives of Catholic, Jewish, Protestant, Quaker, and Seventh-Day Adventist groups have been consulted and have participated in the discussions which have led to the framing of this bill. Religious and lay organizations which have operated for years in the immigration field have lent the benefit of their experience in the formulation of this measure.

These groups have been especially concerned over restrictive and discriminatory provisions of S. 2550. Minority groups and nationality groups have been similarly struck. The objections thus voiced to S. 2550, and to the McCarran bill from which S. 2550 evolved, have been taken into account in drafting our bill.

Our bill is based primarily on the philosophy and assumption that immigration in limited and practicable amounts is good for our country. In the past immigration has provided the infusion of new blood through which our country has grown strong and dynamic. This infusion must continue and be increased, for the sake of our own national strength and interest, as well as to help the individuals—the escapees from tyranny, poverty, and wretchedness. In the present hour this is vital for the successful conduct of our foreign policy.

Some of the further effects and operations of our omnibus bill are summarized as follows (a summary of most of the actual terms of our bill is attached as a separate document):

1. Our bill, by basing the quota system on the Census of 1950, instead of 1920, and by abolishing the intolerable exclusion of American Negroes from the census for quota-determination purposes, would increase the total quota by approximately 60,000 persons annually.

2. Our bill, by authorizing the pooling and utilization of the unused portions of the quotas now in effect, would make the entire quota system more flexible and more realistic and would permit the entrance of a further number of 50,000-70,000 persons annually. (Britain, for example, now has a quota of 65,000 of which only a small fraction is used.)

3. Our bill, through its system of preferences, would permit the use of otherwise unused quota numbers for:

(1) Religious and political persecutees.
(2) Escapees from behind the iron curtain.
(3) Displaced persons who were unable to meet the dateline requirements of the Displaced Persons Act.
(4) Displaced persons who qualified under our Displaced Persons Act and had completed their processing but who failed to secure visas by the time the Displaced Persons Act deadline had passed.
(5) Otherwise qualified persons in countries, where the pressure of surplus population constitutes a threat to the economic life and the internal stability of the country concerned, but whose quotas are already far oversubscribed.
(6) Relatives of United States citizens and of aliens permanently resident in the United States.

4. The so-called "pooling" of the unused quotas would be of special benefit to otherwise qualified persons from the following countries and areas: Italy, Poland, Greece, Holland, Czechoslovakia, Hungary, Germany, Austria, Yugoslavia, Venezia Guilia, the Middle East—especially refugees.

It is not the purpose of our bill to require the United States, by itself, to try to solve the problem of overpopulation in certain areas of Europe, or the problem of refugees in Germany, or in the Middle East. Our bill does, however, provide for a modest United States contribution to the solution of these problems. The entire problem, involving mass migrations, requires a cooperative world effort on many complex fronts. Such an effort has, in fact, been launched.

The limited additional number of immigrants proposed to be admitted to this

country under the terms of our bill would be selected on the basis of the preferences and qualifications set forth in the bill from the vast numbers seeking admission to this country.

It would be possible, of course, during the present world emergency, to divide, by a practicable formula, the unused quota numbers among the nationalities and groups listed above. This could be accomplished by simple amendment to this bill. For the long run, however, we believe that preference should be extended on an individual rather than on a nationality basis.

5. Our bill would amend existing law to admit, on a nonquota basis: (1) alien parents and children of American citizens; (2) aliens who have served honorably in the American Armed Forces; and (3) orphans brought into this country for adoption. S. 2550 does none of these things.

6. Our bill eliminates the present mortgages on quotas required by the Displaced Persons Act of 1948 and other legislation. These mortgages reduce the number of any nationality quota for future years by the number of immigrants of that group who were admitted to this country under the Displaced Persons Act.

One-half of the quotas for some countries is "mortgaged" many years into the future. For instance, the quota for Greece is mortgaged until the year 2013; Latvia until 2274; Estonia until 2146; Hungary until 1985; Lithuania until 2087; and Poland until 1999. Yet these are the very countries whose refugees most urgently need asylum in this country. We propose to strike out these restrictive mortgages as unrealistic and prejudicial to our national interest.

7. Another feature of our bill is its elimination of an obscure but shocking provision discriminatory against Negroes. The present immigration law stipulates that "the descendants of slave immigrants" be excluded from any computation of the population of the United States in 1920 for the purpose of determining quotas and quota eligibility. S. 2550 does not propose to change this highly discriminatory aspect of present law.

As a matter of fact, S. 2550 actually introduces new discriminatory provisions, aimed, among other things, to forestall immigration from colonial areas, thus unjustifiably affronting all colored races and peoples. Designed to establish tight statutory limits on immigration from Jamaica, Trinidad, and other colonies of the British West Indies, the provisions in question are offensive and discriminatory in principle.

8. Our bill provides that non-quota status be granted to all natives of the Western Hemisphere, including persons born in Western Hemisphere colonies. This represents little practical change from present law, which grants nonquota status to all Western Hemisphere nations other than colonials and includes colonials within the quotas of their mother countries.

9. Our bill eliminates the present bar against the admission of some Asiatics and provides for proportional quotas to Japanese, Burmese, Koreans, and other Asiatic groups who at present have no quotas; our bill also provides proportional quotas for Chinese, Indians, and others who are presently limited to a maximum quota of 100. S. 2550, while eliminating the outright prohibitions against immigration from Japan, Korea, Burma, etc., establishes a new discrimination in the form of an Asia-Pacific triangle, with a discriminatory test of "nationality-by-origin" instead of "by birth" for this area.

10. Our bill, while reenacting the provisions of the Internal Security Act of 1950 providing for the absolute exclusion of subversive aliens, nevertheless recognizes that reformed totalitarians can be stanch defenders of democracy and, therefore, authorizes their admission in connection with proper safeguards.

SUMMARY OF NEW OMNIBUS IMMIGRATION AND NATURALIZATION BILL

The proposed new omnibus immigration and naturalization bill (new omnibus bill) would modernize the quota system by basing quotas on the 1950 census (thus increasing the total quota), would provide greater flexibility in the operation of the quota system by allowing the pooling of unused quotas, and would eliminate racial discrimination. It would admit to this country additional classes of deserving aliens without regard to quota restrictions and would establish a system of preferences, based on national need and family reunion, for most quota immigrants while at the same time reserving a portion of each quota for self-initiated immigration. The new omnibus bill would assure adequate review of denial of visas and denial of admission to this country and would make the McCarran-Walter Administrative Procedure Act applicable to deportation cases. It would provide adequate protection against subversive and other undesirable aliens without resorting to abusable and repressive restrictions.

In these provisions and in other vital matters of substance the new omnibus bill differs from S. 2550, recently reported by the Senate Judiciary Committee. The two bills correspond in general form, and in making many technical changes involved in codifying existing immigration and naturalization laws.

The following summary of the major provisions of the new omnibus bill emphasizes the principal changes that would be made in existing law and the most important differences between the new omnibus bill and S. 2550.

1. Nonquota status: The new omnibus bill would add several new classes of nonquota immigrants to those of existing law. Recognizing the desirability of reuniting families, the bill would exempt the immigrant parents of citizens from quota limitations. Other classes deserving special consideration to which nonquota status would be accorded are orphans entering the country for adoption and immigrants who have served honorably in the Armed Forces. Existing laws grant nonquota status to immigrants born in Canada or in independent countries in Latin America but deny such status to immigrants born in colonies or dependent areas in the Western Hemisphere. The new omnibus bill would correct this obvious inequity. Furthermore, S. 2550 would require professors, who are now admitted as nonquota immigrants, to enter under quota restrictions. S. 2550 places unnecessary restrictions even on the time-honored nonquota status of religious ministers. The new omnibus bill would strengthen the provisions of existing law in regard to both ministers and professors.

2. Quotas: While adhering to the principle of establishing a ceiling on immigration and while retaining the national origins quota system as the basis for the initial allocation of quotas, the new omnibus bill would make a number of much-needed improvements in the operation of the quota system.

By providing for the use of the 1950 census as the basis for calculating quotas, rather than basing quotas on the 1920 census as would S. 2550, the new omnibus bill would take into account increases in population and changes in the composition of the population which have taken place in the last 30 years.

The new omnibus bill would amend existing law so as to eliminate racially discriminatory features remaining from the Oriental Exclusion Act—the features which have been so bitterly resented throughout Asia. S. 2550, too, purports to eliminate racial discrimination, but, instead, merely disguises it in a new form. In S. 2550 certain oriental nations are given, for the first time, minimum quotas of 100 and the right to naturalization. But in place of outright exclusion, there is substituted the novel concept of an Asia-Pacific triangle with a total limit of immigration from this area, and a mortgage against quotas in this area for all immigrants, wherever born, who can trace as much as 50 percent of their ancestry back to this area, however remotely.

The new omnibus bill abjures not only this new form of racial discrimination but all other racial discrimination existing in present law. Thus, the new omnibus bill rejects the intolerable exclusion of American Negroes from the census for purposes of establishing quotas, an exclusion provided in the Immigration Act of 1924 and proposed to be perpetuated in S. 2550.

Also the new omnibus bill would grant equal nonquota status to all nations and dependencies in the Western Hemisphere, avoiding the further racially discriminating feature of S. 2550 which limits to 100 the possible immigrants from colonies, even those within the Western Hemisphere; this feature of S. 2550 discriminates especially against the natives of Jamaica, Trinidad, and other Caribbean dependencies. (Present law gives these latter nationals the equivalent of nonquota status by charging immigrants from these dependencies against the quotas of the mother countries.)

S. 2550, in addition to its other racially restrictive and discriminatory features, places an outside limit of 2,000 on immigration of persons either coming from the so-called Asia-Pacific triangle, or born outside this geographic area but tracing as much as 50 percent of their ancestry back to it. S. 2550 provides further for the reduction in the minimum quotas of countries within the Asia-Pacific triangle if their combined quotas should ever exceed 2,000. The new omnibus bill avoids all these novel, provocative, and discriminatory features.

In the allotment of most quota immigrant visas, the new omnibus bill would give preference to persons whose services are urgently needed in this country and to certain relatives of citizens and of aliens admitted for permanent residence. Unlike S. 2550, the new omnibus bill would set aside a portion of each quota to encourage self-initiated so-called "new seed" immigration, in addition to making available for that purpose quota numbers not used by preferred immigrants.

By providing for the pooling of unused quotas, the revised bill, unlike S. 2550, would remedy one of the most serious shortcomings of our immigration system. Experience has shown that while some quotas are generally oversubscribed, others have consistently been used to only a small extent and that, as a result, only 44 percent of the authorized quota immigration visas has ever been issued. It has generally been recognized that, in its operation, the rigid structure of the quota system has discriminated against natives of southern and eastern Europe. The new omnibus bill would alleviate this situation by allowing quota numbers which remain unused during any given fiscal year to be used during the following year without reference to national origin.

Pooled quota numbers would be issued on a preferential basis to relatives of citizens and of aliens admitted for permanent residence, to persons whose services are urgently needed in this country, to persons who have been persecuted abroad on racial or religious grounds or because of their adherence to democratic beliefs, and to persons whose cases, because of special circumstances or hardship, merit special consideration.

The new omnibus bill would eliminate charges made against quotas by the Displaced Persons Act. No good purpose can be served by continuing to permit these quota mortgages, some of which extend well into the next century, to bar the present immigration of qualified aliens.

These quota mortgages bear especially heavily on countries like Lithuania,

Latvia, Estonia, and Poland, whose nationals, refugees from the Soviet terror, most desperately need to find haven in the United States.

3. Exclusion: The new omnibus bill would establish, as would S. 2550, several new grounds for excluding undesirable aliens such as persons who have violated narcotics laws, laborers who would actually displace American workers, and persons who have been convicted in their own countries of two or more offenses (other than purely political offenses) not involving moral turpitude. In the latter case, the new omnibus bill, unlike S. 2550, would permit exceptions to be made on the basis of special circumstances.

In general, the new omnibus bill relies to a greater extent on factual grounds for exclusion than does S. 2550, which relies heavily on the opinion and belief of administrative officials.

The new omnibus bill contains provisions similar to those of the Internal Security Act of 1950 relating to the exclusion of subversive aliens.

These provisions are designed to prevent the admission of persons subscribing to the practices or teachings of the world Communist movement, or of any movement whose object is the establishment of totalitarian government in the United States, or the control of the United States by a foreign power.

Past association with such movement or doctrines is deemed presumptive evidence of ineligibility for admission into the United States. But individuals who have broken with their past and who can show positive and conclusive evidence that they are antitotalitarian are made admissible. The new omnibus bill and S. 2550 have similar provisions to this effect.

The new omnibus bill, however, is consistent in its treatment of such reformed persons, among whom are found some of the stanchest and most effective fighters against communism. S. 2550, however, while admitting the possibility that aliens abroad who once were associated with totalitarian movements can break with the past and reform, makes no such allowance for aliens within the United States. Aliens legally resident in the United States who have belonged to Communist or even to Communist-front organizations, no matter how remotely in the past, are made automatically deportable. The fact that they may have broken completely with their past and become outstanding advocates of democracy is no bar to deportation under the terms of S. 2550.

The new omnibus bill, like S. 2550, places new restrictions and safeguards against the entry of stowaways and other illegal entrants, and would protect the United States against the discharge of alien seamen at ports within this country.

The new omnibus bill would grant the President the right, in time of war or national emergency, to suspend all immigration, or, in such emergency periods, to admit temporarily any aliens whose entry would be in the national interest. This is in contrast with comparable provisions of S. 2550 which would simply authorize the President to suspend all immigration at any time in his discretion; no standards are established for the exercise of this extreme and extraordinary authority.

4. Board of Immigration Appeals and Visa Review Board: The new omnibus bill makes provision for adequate review of administrative actions, both in the granting of visas and in deportation proceedings. A statutory basis is provided for the Board of Immigration Appeals, and it is made an independent board, to assure its freedom from administrative influence in weighing appeals and reviews in deportation cases.

A Visa Review Board is established within the State Department to handle appeals on the granting of visas by consular officials. This is designed to provide uniformity of practice in the granting of visas; the absolute right of appeal is reserved to American citizens who have filed petitions in behalf of would-be immigrants on the basis of blood relationship or other preference qualification.

5. Deportation: The new omnibus bill grants new powers to the Attorney General to accomplish deportation more effectively and expeditiously. It establishes new grounds for deportation, analogous to the new grounds for exclusion of would-be immigrants. These powers are surrounded, however, with safeguards assuring the right of review and appeal, based on facts and findings, rather than on mere opinion or belief as provided in numerous provisions of S. 2550.

In the new omnibus bill the provisions of the McCarran-Walter Administrative Procedures Act are made applicable to deportation proceedings, along with provision for review by the Board of Immigration Appeals. S. 2550 specifically exempts deportation proceedings from the terms of the Administrative Procedures Act.

The new omnibus bill makes involvement in subversive activities grounds for deportation. Present membership in Communist or Communist-front organizations is made grounds for deportation, except that in the case of Communist-front organizations, nonawareness of the nature of the organization can be successfully pleaded if proved.

Under S. 2550, many new grounds for deportation would be retroactively applicable. An alien could be deported for an act which did not constitute a ground for deportation when committed. The new omnibus bill makes the new grounds for deportation applicable only to acts performed after the new bill becomes law.

S. 2550 would so restrict the discretionary authority of the Attorney General to suspend deportation that such authority would be meaningless. The new omnibus bill recognizes that extenuating circumstances may make deportation unduly harsh in certain cases and would give the Attorney General broader authority to suspend deportation than would S. 2550.

The new omnibus bill, unlike S. 2550, would restrain deportation to any country in which an alien would be subjected to any form of persecution because of race, religion, or political opinion. S. 2550 would permit deportation to any country unless the deportee would face in such country actual physical persecution.

6. Naturalization and denaturalization: The new omnibus bill and S. 2550 include many similar provisions governing naturalization, denaturalization, and expatriation. However, the new omnibus bill, unlike S. 2550, would not erect unnecessary barriers to naturalization, such as the stipulation of S. 2550 that any absence from the United States, of whatever duration, would break the continuity of required residence.

The new omnibus immigration bill eliminates, for all practical purposes, the distinctions, of recent origin and of doubtful constitutional validity, between naturalized and native-born citizens.

The new omnibus bill eliminates from present law the provision, included in S. 2550, that naturalized citizens who join Communist-front organizations can be denaturalized. The new omnibus bill reenacts the provisions of present law which provides for denaturalization in any case where fraud and illegality occurred in procuring naturalization.

The new omnibus bill would permit, under careful safeguards, the naturalization of persons who, because of religious training or belief, object to swearing to bear arms. S. 2550 would bar such persons from naturalization.

7. Other provisions: The new omnibus bill would establish a Joint Committee on Immigration and Naturalization Policy, composed of members of the Senate and House Judiciary Committees, to make a continuous study of the administration of immigration and naturalization laws, the effect of such laws on the national security, economy, and social welfare of the United States, and other matters having a bearing on immigration and naturalization policy. S. 2550 would not establish this highly important committee.

The new omnibus bill would not, as would S. 2550, tamper with the internal organization of the Department of State in violation of the Hoover Commission's recommendations in order to create a Bureau of Security and Consular Affairs. However, the new omnibus bill would make available to the Secretary of State a position at a salary equal to that paid the highest grade of the classified civil service. Such a position will give adequate recognition to the officer to whom the Secretary of State may delegate authority to supervise the Department's consular activities under the bill.

The new omnibus bill would not, as would S. 2550, confuse lines of authority in both the Departments of State and Justice.

Under existing laws carriers are, except in certain well-defined cases, required to pay the detention and deportation expenses of aliens whom they have brought to this country and who must be detained for examination or deported. Administrative fines are levied against carriers for bringing certain aliens to this country. S. 2550 would incorporate into the law vague new provisions for the relief of carriers, foreign as well as domestic, from expenses and fines and would probably have the effect of shifting the payment of most such expenses to United States taxpayers. The new omnibus bill would retain provisions similar to those of present laws at least until further examination can be made of this matter.

NOTICE OF HEARING ON NOMINATION OF PHILIP L. RICE TO BE JUDGE OF THE FIFTH CIRCUIT, CIRCUIT COURTS, TERRITORY OF HAWAII

Mr. McCARRAN. Mr. President, on behalf of the Committee on the Judiciary, and in acordance with the rules of the committee, I desire to give notice that a public hearing has been scheduled for Friday, March 21, 1952, at 2 p. m., in room 424, Senate Office Building, upon the nomination of Hon. Philip L. Rice, of Hawaii, to be judge of the Fifth Circuit, Circuit Courts, Territory of Hawaii. Judge Rice is now serving in this post under an appointment which expired July 30, 1951. At the indicated time and place all persons interested in the nomination may make such representations as may be pertinent. The subcommittee consists of the Senator from Nevada [Mr. McCarran], chairman; the Senator from Washington [Mr. Magnuson]; and the Senator from Indiana [Mr. Jenner].

ADDRESSES, EDITORIALS, ARTICLES, ETC., PRINTED IN THE APPENDIX

On request, and by unanimous consent, addresses, editorials, articles, etc., were ordered to be printed in the Appendix, as follows:

By Mr. IVES:
Address entitled "Why Eisenhower Is Needed as President," delivered by Paul G. Hoffman, and published in the New York Herald Tribune of March 6, 1952.

By Mr. SMATHERS:
Copy of a letter written by him to the Secretary of Agriculture and an article entitled